## KIPLING v. G. P. PUTNAM'S SONS et al.

(Circuit Court of Appeals, Second Circuit. January 8, 1903.)

### No. 12.

1. COPYRIGHT—INFRINGEMENT—RIGHT OF PURCHASER OF UNBOUND SHEETS TO BIND AND RESELL.

One who has purchased unbound copyrighted volumes from the owner of the copyright or his licensee has the right, so far as the copyright statute is concerned, to bind and resell the same.

2. SAME—EFFECT OF COPYRIGHT OF NEW EDITION.

The copyrighting of the volumes of a particular edition of an author's works, which had been previously published some with and some without copyright, protects only what is original in the new edition, and does not enlarge the rights of the owner of the copyright as to any matter previously published.

3. SAME—RIGHT OF LICENSEE TO SELL UNBOUND SHEETS.

There is nothing in the copyright law which prohibits a licensee of the owner of a copyright for books from selling the same in unbound sheets, nor can the rights of a purchaser of such sheets with respect to binding and reselling the same be affected by any private agreement between the licensee and owner.

4. TRADE-MARK—USE NECESSARY TO GIVE PROPRIETARY RIGHT.

Conceding that an author might protect his writings by a trade-mark, the mere fact that an ornamental device was stamped on a single edition of his works published in this country without any notice that it was intended as a trade-mark, and that a similar device was printed some years before on a few volumes of his works published in India, in connection with the publisher's name, while other editions printed in this country and in England were without it, does not entitle it to protection as a trade-mark.

5. UNFAIR COMPETITION—EVIDENCE TO ESTABLISH.

Defendants purchased copyrighted sheets of plaintiff's works from licensed publishers, and bound them into sets, which they sold. There was no attempt to imitate any other edition in style or appearance, nor to deceive purchasers, the only similarity being in the use of a single device on the cover, similar to one used on another edition; nor was it shown that any purchaser was actually deceived. *Held*, that such facts did not entitle plaintiff to damages for unfair competition.

In Error to the Circuit Court of the United States for the Southern District of New York.

John L. Hill and A. T. Gurlitz, for plaintiff in error.

Stephen H. Olin, for defendants in error.

Before WALLACE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. This action was commenced April 24, 1899, to recover $25,000 damages for infringements of plaintiff's copyrights and trade-mark and for unfair competition in trade. In 1898 the defendants, who, for many years prior thereto had been engaged in publishing and selling books in the city of New York, purchased from authorized publishers about 30 sets of various copyrighted volumes of the plaintiff's writings, bound them in uniform and attractive binding and sold them without protest or complaint from any source. This enterprise being successful, the defendants, in the following year, determined to collect from his authorized publishers a more complete set of the plaintiff's works and sell them under the name of the "Brushwood" edition. About 200 copies of unbound sheets were thus collected. One hundred of these were for the defendants and 100 for E. P. Dutton & Co., a publishing house, having its place of business near the defendants on Twenty-Third street, New York. The defendants bound the sets thus purchased in 12 volumes in the exact form in which they were received from the publishers.

Volume 13 contained poems of the plaintiff, which had been published without copyright protection, the sheets being purchased from Coates & Co., who printed them from stereotype plates of an edition, apparently authorized by the plaintiff, under contracts by which he was to receive a royalty of 10 per cent. These plates were purchased by Coates & Co. of the receiver of the United States Book Company.

Volume 14 was made up of unbound copyrighted sheets of "The Seven Seas," purchased from D. Appleton & Co., and two uncopyrighted poems—"The Vampire" and "Recessional."

Volume 15 contained "A Ken of Kipling," by Will M. Clemens, and an index. The only portion of the edition printed by the defendants was this index; all else was in the precise form in which it was purchased by them. The binding was uniform for each set, but some sets were more expensively bound than others. Fifteen sets were bound in buckram and on the back of each volume there was stamped in gold, on dark green leather, an elephant's head enclosed in a circle. On the front cover, near the top, there was stamped in gold, on a panel of green leather, a similar elephant's head and also a fac simile of the plaintiff's signature. The elephant's head appeared only on the books composing these 15 sets.

The "Brushwood" edition thus made up was advertised and sold in the usual way.

Briefly stated these are the acts of the defendants of which the plaintiff complains.

In 1896 the plaintiff arranged with Messrs. Charles Scribner's Sons to publish a new subscription edition of his works, under his super-

vision, to be known as the "Outward Bound" edition. The first installment of this edition consisted of 12 volumes, the first volume being published in January, 1897, the last in October, 1898, and the others at intervals between these dates. The "Outward Bound" volumes were larger, wider and thicker than those sold by the defendants. On the center of the front cover of each volume was a medallion, stamped in low relief, of an elephant's head in white, surrounded by golden circles. The head also appears on the title page of each volume and is called a "seal" by the author.

There was evidence that, some 10 years prior to the "Outward Bound" edition, an elephant's head had appeared on the paper covers of several small volumes of the plaintiff's works printed in India, but under circumstances which indicated to the public that if it were intended as a trade-mark at all, it was the mark of the publishers and not of the author. There is no evidence in the record which can be regarded as constituting direct or constructive notice to the public that, at the time in controversy, the plaintiff was attempting to protect by a trade-mark his profession as a novelist and poet.

In May or June, 1899, the plaintiff authorized a "Big Syndicated Set" of his works, which was handled by the publishing house of Doubleday & McClure Company. It was revised and corrected by him and was called the "Swastika" authorized edition. It was printed from plates held by his publishers and consisted of 300,000 volumes, or 20,000 sets. No elephant's head appears on the volumes of this edition. Instead thereof, and occupying the same position, there is stamped on the cover of each volume a medallion in the center of which appear, in script, the letters "R. K."

The advertisements of the "Brushwood" edition first put out by the defendants caused some inquiries to be made by the Scribners and, in order to meet objections then suggested, new circulars and notices were immediately issued and published, making perfectly clear the genesis of the "Brushwood" books and the defendants' position regarding the same.

The plaintiff maintains that the selling of the "Brushwood" edition by the defendants violated his copyrights and trade-mark and that the defendants' conduct with reference to the "Outward Bound" edition, published by the Scribners and authorized by him, amounted to unfair competition in trade. The defendants insist that all the books sold by them, which were copyrighted, were purchased of plaintiff's authorized publishers, that the plaintiff has failed to establish a trade-mark and that in the sale of the "Brushwood" edition their conduct was in all respects fair and honorable.

The trial judge, being of the opinion that the plaintiff had failed to establish a cause of action, either for infringement or for unfair competition, directed a verdict in favor of the defendants. The plaintiff insists that this ruling was error and he also assigns as error various rulings upon the rejection and reception of testimony.

First.—It is contended by the plaintiff that in selling the "Brushwood" edition of his works the defendants have infringed his copyrights. There is no matter published in the "Brushwood" edition, secured to the plaintiff under the copyright law of the United States,

which was not purchased by the defendants of publishers duly authorized by the plaintiff to sell. The edition was made up, first, of volumes copyrighted by the plaintiff or his publishers, which, in legal effect, the defendants purchased of him; second, of certain poems written ·by the plaintiff, but published without the protection of a copyright, and, third, of matter written or compiled by others and over which the plaintiff exercised no ownership or control. Upon what theory, then, have the plaintiff's copyrights been infringed? Each one of them, whether valid or invalid, was respected by the defendants. That the defendants, having purchased unbound copyrighted volumes, were at liberty, so far as the copyright statute is concerned, to bind and resell them, is a well-recognized principle of law. Harrison v. Maynard, 10 C. C. A. 17, 61 Fed. 689; Doan v. American Book Co., 45 C. C. A. 42, 105 Fed. 772.

It is of no moment that each volume of the "Outward Bound" edition authorized by the plaintiff and published by Charles Scribner's Sons, in 1897–98, was copyrighted. This new copyright protected only what was original in the "Outward Bound" edition. It did not operate to extend or enlarge prior copyrights or remove from the public domain the author's works which, by his own act, he had dedicated to the public. If, for instance, the Messrs. Scribner should publish a new edition of Fielding's works their copyright would cover only that part of the edition which is new. It would not enable them to hold a monopoly in Fielding's writings. Any other publisher could publish Fielding's works with perfect propriety. So, if the defendants were legally authorized to sell the works of the plaintiff found in the "Brushwood" edition, that right was not lost or impaired by the copyrighting of the "Outward Bound" volumes. It is contended that, the plaintiff's copyrights were infringed by the defendants because the books or sheets which they purchased of his licensed publishers were· unbound at the time and the publishers were unauthorized to sell them in this condition. It is not quite apparent how the intent and purpose of the copyright act can be limited by a private agreement between the author and his publisher. There is nothing in the law, surely, which prohibits the owner of a copyright from selling unbound books, if he desires to do so, and what he may do, his agent or licensee may do also. If Mr. Kipling had personally sold the unbound volumes to defendants it probably would not be contended that he could recover damages under the statute because they were bound and resold. He stands in no more favorable condition because the sale was conducted by his agents.

We are unable to find any provision in the agreements with plaintiff's publishers which prohibited the sale of the copyrighted sheets to the defendants, but if such a provision were present the plaintiff's remedy would be· an action against the publishers for breach of contract. Whether such an action could be maintained by one who had participated in the profits of the sale is a question which would probably cause the pleader many moments of anxious thought. Harrison v. Maynard, supra.

The "Ken of Kipling," which appears in the "Brushwood" edition, was not copyrighted by plaintiff, and the defendants, so far as the

copyright law is concerned, had an absolute right to publish it in any form they saw fit.

They also were at liberty to make and publish an index of the matter contained in their volumes even though the index, as it necessarily must, contains words and phrases found in the text.

The court is not permitted to enter the domain of ethics and attempt a determination of this controversy according to the theoretical code of morals which, it is contended, should govern the relations between author and publisher. We must adhere strictly to the law, as we understand it, and, with the issue thus limited, we have no difficulty in agreeing with the Circuit Court that the plaintiff has failed utterly in establishing a cause of action under the copyright law.

Second.—The plaintiff insists that he has a valid trade-mark, consisting of an elephant's head, by which his productions have been known and protected and that the defendants have infringed by placing an elephant's head upon thirty sets of the "Brushwood" edition. The proposition that an author can protect his writings by a trade-mark is unique and, at first blush, seems somewhat startling. It is certainly offensive to the æsthetic and poetic taste to place such poems as the "Recessional" and "The Last Chantey" in the same category with pills and soap, to be dealt in as so much merchandise. We do not intend to decide that such a trade-mark is sanctioned by the law, but even if it were, it is manifest that the mark does not lose its characteristics because used to designate an unusual variety of "goods." In other words, the author, assuming that he may have such protection, must comply with the law if he would have a valid trade-mark.

A trade-mark is a word, symbol or device by which the wares of the owner are known in trade. Its object is, first, to protect the party using it from competition with inferior articles, and, second, to protect the public from imposition. The trade-mark brands the goods as genuine, just as the signature to a letter stamps it as authentic. The elephant's head was not registered as a trade-mark until long after the commencement of this action and there is no evidence that it was ever so used by the plaintiff until placed upon the "Outward Bound" edition, certainly there is no evidence that it was ever so used in this country or in England. There is proof that, in 1888, an elephant's head appeared upon six books written by the plaintiff and published at Allahabad, in India, by A. H. Wheeler & Co. There is nothing to show that the plaintiff ever publicly claimed the elephant's head as his trade-mark. On the contrary it appeared to be the mark of the publishers and not of the author. In each instance the head was surrounded by the words "A. H. Wheeler & Co.'s Indian Railway Library." If the words "Charles Scribner's Sons, Fifth Avenue, New York," had surrounded the medallion on the cover of the volumes published by that firm it is not probable that it would be seriously contended that this was notice to the world that the medallion was the trade-mark of Mr. Kipling. In short, there is nothing to show that the plaintiff ever publicly used the elephant's head as his trade-mark prior to its use on the "Outward Bound" edition and there was nothing connected with or incident to that

use to inform the public that the plaintiff asserted any right therein as a trade-mark. The court will take judicial knowledge of the fact that it is customary to publish books with ornamental designs stamped or printed on the covers, but no one, we venture to think, from the discovery of the art of printing to the present day, ever imagined that such pictures and ornaments were the trade-marks of the authors of the books. Indeed, there is a design, probably intended to represent a lotus flower, printed upon the back of each volume of the "Outward Bound" edition. So far as any knowledge of the public is concerned this lotus flower, or the initials "R. K." on the "Swastika" edition, might be claimed as trade-marks with as much reason as the elephant's head. The suit, in so far as it is based upon the infringement of a trade-mark, should be considered as if this were the only cause of action stated. It is thought that it must fail because of insufficiency of proof to establish a common-law trade-mark, either by direct notice or prior public use, and because there is an absolute failure to prove damages.

Third.—Has the plaintiff established a cause of action under the allegations of his complaint alleging unfair competition in trade? Actions of this character are based essentially upon fraud. Fraud must be proved, it cannot be inferred from unimportant similarities not calculated to mislead the purchaser. The action may be maintained where it appears that the defendant is destroying, or attempting to destroy, an honest business by dishonest means. The gravamen of the action is a fraudulent purpose on the part of the defendant to represent to the public that the plaintiff's business is his business and by fraudulent misstatements to deprive the plaintiff of profits which he would otherwise receive. Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 549, 11 Sup. Ct. 396, 34 L. Ed. 997.

Has the plaintiff proved the defendants guilty of such fraud? In answering this question we start with the proposition, about which we think there can be no doubt, that the defendants had an unquestioned legal right to sell all of the plaintiff's writings contained in the "Brushwood" edition. It is well-nigh impossible to suppose that any one intending to purchase the "Outward Bound" edition could be induced to purchase the "Brushwood" instead. There is no proof that any one was deceived. The two editions differ in almost all essential features. The volumes are unlike in size, shape, binding, color, arrangement and typography. In their advertisements the aim of the defendants was not to make the public believe that their edition was the same as the "Outward Bound," but that it was more complete than that or any other edition.

What, then, is the accusation against the defendants? When reduced to its last analysis it will be found to be the use of the elephant's head upon 15 sets printed for themselves and 15 printed for E. P. Dutton & Co. The use of this device was an impropriety, but, in view of all the surrounding facts and circumstances, it was wholly insufficient to sustain a charge of intentional deception. The conduct of the defendants was that of fair-minded competitors who had no purpose to misrepresent their own edition as the "Outward Bound" edition. They showed a disposition to remove all grounds of com-

plaint, both real and imaginary, and, upon being informed of them, promptly discontinued all the objectionable features of which the plain· tiff had the least right to complain.

There is no proof of direct damage and the theory of consequential and remote injury advanced by the plaintiff is too speculative to be entertained.

The "Swastika" edition, published, in the spring of 1899, through the house of Doubleday & McClure Company, was properly received in evidence. As before stated this was an edition of 20,000 sets "authorized" by the plaintiff and made up, precisely as the "Brushwood" was made up, by purchasing unbound sheets from authorized publishers. On each of the 300,000 volumes were the words "Authorized Edition," but there was no elephant's head. On the "Swastika" boxes containing the volumes are the words "This Edition Sold Only in Sets." It was competent to show that, after the publication of the "Outward Bound" edition the plaintiff's conduct regarding that edition had been in many respects identical with the defendants' conduct of which he complains. The "Swastika" proof shows the plaintiff's acts to be in conflict with the law of unfair competition as interpreted by his counsel and wholly inconsistent with the theory of damages advanced in his behalf.

In view of the opinion entertained upon the merits we deem it unnecessary to pass upon the numerous exceptions taken to the rejection and admission of testimony.

The judgment is affirmed.