CAPEWELL HORSE NAIL CO. v. PUTNAM NAIL CO.

(Circuit Court, D. Massachusetts. November 8, 1905.)

No. 1,765.

1. TRADE-MARKS—PATTERN ON ARTICLE OF MANUFACTURE.

Complainant was a manufacturer of horseshoe nails sold to the trade in cartons and boxes, and for a number of years had placed on the face of the head of one of its several brands of nails a common form of check pattern formed by the intersection of diagonal lines, and made by the die which formed the head. The president of complainant testified that the marking was adopted as an ornamentation, and as a distinguishing mark of complainant's make, but public attention was not called to it in the advertisements of complainant, nor upon its cartons or boxes which displayed its registered trade-mark and other matters of information. *Held,* that the fact of such use alone did not constitute the marking a trademark, in the absence of clear proof that it was adopted and used as such, or that it had become associated in the mind of the public with complainant's make of nails.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trade-Marks and Trade-Names, §§ 29–31.]

2. SAME—UNFAIR COMPETITION.

The stamping by defendant on one side of the head of horseshoe nails made by it of a diagonal check pattern in prior use by complainant did not constitute unfair competition, where the cartons and boxes in which the nails were sold were entirely unlike those used by complainant, and

there was no attempt to deceive purchasers into buying the nails as those of complainant, and where it was further shown that the mark resulted from "knurling" one face of the die to secure its better operation.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trade-Marks and Trade-Names, §§ 78–82.

Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

In Equity. Suit for infringement of trade-mark and unfair competition.

Edmund Wetmore, for complainant.

William K. Richardson and Warner, Warner & Stackpole, for defendant.

COLT, Circuit Judge. This suit relates to a trade-mark. The parties are manufacturers of cold-rolled horseshoe nails. The complainant claims a trade-mark in the pattern impressed upon the front face of the head of each nail. The pattern is first imprinted on the face of one of the heading dies, and the impression on the nail is made during the operation of heading. This pattern consists of a series of small diamond-shaped checks formed by a succession of intersecting diagonal lines. The pattern itself is old. It is, perhaps, the most common form of "knurling" or roughening the surface of articles like vices and pincers, to prevent slipping.

The complainant was the first to use these checks upon the heads of horseshoe nails. This use began in 1892, and since that time the leading brand of complainant's nails has been stamped with this design. Since July, 1902, the defendant has used identically the same checks upon its nails. It is not uncommon for manufacturers of nails to impress a mark of some character upon the head or surface of each nail. This may be done either for the purpose of a distinguishing mark, or for the purpose of ornament, or it may be merely an incident in the process of manufacture.

The defense rests mainly on two grounds: First, the failure of the complainant to prove that it ever adopted this check pattern as a trade-mark, or that the public regard it as designating the complainant's goods; and, second, that this pattern is not the proper subject of a trade-mark, for several reasons: Because it is an ancient and common form of knurling; because it relates to the form, appearance, or finish of a manufactured article; and because it is a necessary incident in the manufacture of cold-rolled nails in defendant's machines, due to the roughening of one of the dies to prevent heating.

Taking up the first defense, we find that the bill alleges that "the complainant adopted as its mark, by which its leading brand of 'Capewell' nails might become known, a pattern of small checks stamped upon the front face of the head of each nail"; that these checks "have been and are associated in the minds of the public and the purchasers and users of said nails with the complainant as the maker thereof"; and that the "check mark has become and is the genuine trade-mark of the complainant, and has been and is recognized and acquiesced in as such by the public generally, and the buyers

and users of such nails, and indicates to such buyers and users the origin of said nails, and that they are of the complainant's manufacture."

Under these allegations of the bill it was necessary for the complainant to establish by proper proof either that this pattern was adopted for the purpose of identifying the origin or ownership of the article to which it is attached, or that the pattern by itself points distinctively to such origin or ownership, or that by association it points distinctively to such origin or ownership. Columbia Mill Company v. Alcorn, 150 U. S. 460, 463, 14 Sup. Ct. 151, 37 L. Ed. 1144.

It is manifest that these checks do not of themselves point to origin or ownership. In other words, they do not in any way indicate that this nail is manufactured by the complainant. The case, therefore, resolves itself into the inquiry whether the evidence shows either that the complainant has adopted this pattern as a trade-mark, or that by association in the public mind it has become a valid trade-mark.

First, as to the adoption of this pattern as a trade-mark:

Mr. Capewell, the founder of the complainant company, testified as follows:

"Q. For what purpose were the dies made to produce the particular check marks which appeared on the face of the complainant's nail? A. It was done for the betterment of the appearance of the nail, and as the distinguishing mark of our make."

This general statement that one of the purposes for which the dies were changed was to make this pattern the distinguishing mark of complainant's nails is manifestly insufficient to prove its adoption as a trade-mark, unless accompanied by some public acts which go to show that this intention was carried into effect, such as calling attention to this mark upon the packages in which the goods are sold, and in the company's advertisements.

The complainant has been engaged in the manufacture of horseshoe nails since January, 1881. Up to 1892 its nails were made with a smooth head. During that year it changed one of the heading dies in its machines from a smooth surface to a checked surface, thereby producing a nail with small checks on the front face of the head. At the time this bill was filed the complainant had continued the manufacture of this form of nail, in large and increasing quantities, for 11 years.

The complainant put up and sold these nails in five-pound packages or cartons, upon which were printed its registered trade-mark, its name, place of business, and other matters of information. It also put up and sold these nails in boxes containing five of these cartons, upon which were printed its registered trade-mark, its name, place of business, and other matters of information. It also advertised extensively in the newspapers, and in the form of printed circulars and cards; yet during all this time there was no reference upon either carton or box, or in any advertisement, circular, or card, to these checks as in any manner identifying the complainant's nails, with the exception (which must be regarded as immaterial, under the

circumstances) of a single circular issued in 1897, five years after this pattern first appeared. It is true that in some advertisements and circulars or cards there is a picture of the Capewell nail, which shows these checks on the face of the head, but there is nothing to indicate that they were intended as a distinguishing mark. The pictures, as a whole, are perfectly consistent with the theory that these checks were made for ornamental purposes, which Mr. Capewell says was one of the objects, or were merely an incident in the process of manufacture caused by roughening the face of one of the heading dies.

It is also significant on this question of adoption that these nails were never called by the complainant "Check Mark Nails," whereas other brands of complainant's manufacture are known by their specific names, such as the "Half Counter Nails," "Goodenough Nails," "Black Prince Nails," "Plate Nails," "Japanese Nails," "Corrugated Nails," and "Alligator Nails." The corrugated nail has corrugations on the surface of the nail, and the alligator nail commonly has the figure of an alligator on the surface of the nail. When the complainant put these checks on the head of its leading brand of nails, if the intention was to make them a distinguishing mark for this brand, why was the nail not called the "Check Mark Nail," and why, as in the case of the alligator nail, were not the words "Check Mark" printed in large letters upon the packages in which the nails were put up and sold?

Upon this state of facts it is clear that the complainant has never adopted or publicly claimed these checks as a trade-mark. When the complainant changed from the smooth-head nail to the check-nail, it apparently made no change in its packages and boxes, and it apparently made no change in its advertisements and circulars further than this, that, when these advertisements or circulars contained the picture of the nail, it was represented correctly with these checks on its head. The real intention of the complainant seems to have been that its leading brand of manufacture should always be known as the "Capewell Horse Nails," whether these nails were made with checks or without checks.

We come now to the second inquiry, whether there is sufficient evidence to support the allegation in the bill that this check pattern has come, by association in the public mind, and among purchasers and users of nails, to designate the complainant's nails. Here there is an entire failure of direct proof. No purchaser or user of nails, nor any one familiar with the trade, has testified that there is any mental connection or association in the public mind or in the trade between this check pattern and the nails made and sold by the complainant. Presumably such evidence does not exist, for the reason that in the usual course of trade these nails are sold in packages or boxes which make no reference to these checks as a distinguishing mark.

The evidence presents simply the fact that for more than 10 years the complainant has put this check pattern upon the heads of its leading brand of nails. But, while this circumstance of long use may be important as laying the foundation for a trade-mark by association, it does not necessarily follow from this fact alone that the public have come to understand that the nails having these checks are made and

sold by the complainant. Where a pattern like this check pattern appears on an article like a nail, which is generally, if not universally, sold in cartons or boxes, and where the pattern may have been intended as a mere ornament, or may be a mere incident in the process of manufacture, some direct evidence is plainly necessary to establish a trade-mark in this pattern by association. In my opinion, upon the state of facts presented in this record, a trade-mark by association cannot be inferred from mere use, but such use should be supplemented by other clear and convincing proof.

Regarding the case in another possible aspect, as one of unfair competition, we find there is no proof of fraudulent intent on the part of the defendant in using this check pattern, nor is there any satisfactory evidence that purchasers of nails in the ordinary course of trade have been, or are likely to be, deceived by reason of the defendant's use of this pattern. It appears that the defendant did not adopt this check mark for the purpose of palming off its goods as those of the complainant, but that its use arose as an incident in the process of manufacture due to the knurling or roughening of one of the heading dies in order to secure better results in the machines it employs. It further appears that the cartons and boxes of the defendant, in which its nails are put up and sold to the trade, bear no resemblance to those of the complainant. To be sure, there is some evidence introduced by the complainant that nails are sold in bulk from boxes, and that in such cases a dishonest retail dealer might deceive purchasers by putting Putnam nails into Capewell boxes, and then weighing them out and selling them for Capewell nails. One witness alone testifies to such a practice on the part of a retail dealer, but in this particular instance the attempt at deception was unsuccessful, for this blacksmith knew a Capewell nail from a Putnam nail, notwithstanding the check mark on the head of the latter. The question in this case, however, is not what a dishonest dealer might accomplish by a trick, but whether the defendant has so dressed its goods as to deceive the ordinary purchaser in the usual course of business; and it is submitted that the complainant's proofs fall far short of establishing this proposition.

The complainant has failed to make out a case of a technical trade-mark or of unfair competition. This conclusion renders the consideration of the other defenses unnecessary.

A decree may be entered dismissing the bill.