**SPRINGFIELD FIRE & MARINE INS. CO. v. FOUNDERS' FIRE & MARINE INS. CO.**

No. 29834.

United States District Court
N. D. California, S. D.

Sept. 24, 1953.

Cooper, White & Cooper, San Francisco, Cal., Townsend, Townsend & Hoppe, San Francisco, Cal., for plaintiff.

Lyon & Lyon, Leonard B. Lyon, Reginald E. Caughey, Los Angeles, Cal., for defendant.

GOODMAN, District Judge.

This case tenders the novel question, whether or not the plaintiff Insurance Company, which uses a picturization of a "covered wagon," drawn by oxen, on its insurance policies, stationery, and advertising media and which registered the picturization as a "service" mark pursuant to the provisions of the Lanham Act, 60 Stat. 427, 15 U.S.C.A. §§ 1051–1127, may enjoin the defendant Insurance Company from using a similar picturization on its policies, stationery, and advertising matter.

Prior to July 5, 1947, the effective date of the Lanham Act, there was no federal statutory provision for registering any mark used in connection with the sale or advertising of "services." Theretofore the federal registering of "trade-marks" had been confined to those affixed to tangible commodities.

Section 45 of the Lanham Act indicates the distinction between "trade-marks" and "service marks" as follows: It defines the term "trade-mark" as any word, name, symbol or device used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others. It defines the term "service mark" to mean a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others.

Plaintiff's complaint sets forth two causes of action. One alleges what might be termed technical "service mark" infringement, i. e. that the defendant's picturization of a "covered wagon" is a colorable imitation of the plaintiff's registered mark.

The second is for unfair competition. It is based upon the ground that the plaintiff's mark has acquired secondary meaning in the industry and that the defendant competes unfairly by using a similar mark. The second cause of action may be summarily disposed of. The ultimate test for unfair competition under the applicable California law[1] is: is the consuming public likely to be deceived. Silvers v. Russell, D.C., 113 F. Supp. 119, 125 and cases there cited. The evidence fails to show that plaintiff's mark has acquired any secondary meaning. It follows therefore that defend-

1. The cause of action for unfair competition has been argued by the parties upon the theory that it is governed by California law under the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188. There are in the Lanham Act certain sweeping provisions, designed to implement various International Conventions to which the United States is a party, which might be construed to create a federal statutory law of unfair competition. See sections 44(h) and 44(i), and the discussion of these sections in Robert, The New Trade-Mark Manual (Washington, D.C. 1947) at xiii–xx and 165–180. But, however that may be, there is nothing in these statutory provisions nor in the International Conventions which would sustain plaintiff's claim of unfair competition under the circumstances of this case.

ant's use of a similar mark would not be deceptive.

An appraisal of the merits of the first cause of action necessitates a fuller statement of the facts of the case. The evidence shows that the plaintiff first began to use the so-called "covered-wagon" picturization as a mark in 1926. In the succeeding years, and prior to registration, the mark was used on the plaintiff company's letterheads, insurance policies, by pictorial display in advertising in newspapers and trade journals, on pamphlets, booklets and circulars concerning its insurance services, and on calendars and similar advertising media. As well, the company has had a fine painting of the "covered-wagon" in the vestibule of its home office in Springfield.[2]

On July 18, 1947, some two weeks after the Lanham Act became effective, plaintiff applied for registration of the "covered-wagon" as a service mark. Registration was issued on September 21, 1948. The registration statement, as well as the evidence, shows that the plaintiff is engaged in the business of writing fire, marine and other similar types of insurance. Its insurance policies are issued upon the order of and through insurance agents and brokers, who deal with the public. The plaintiff company itself has no direct relationship with those who desire to obtain insurance coverage or protection. The brokers and agents order the insurance for the insured, who are customers of the brokers. Equally, the evidence shows the same method of doing business by the defendant insurance company; and also that it uses a representation of a "covered-wagon" drawn by oxen across the prairies, in the same general manner and upon the same type of documents as does the plaintiff. The defendant began the use of such insignia or picturization a short time prior to the passage of the Lanham Act.

The picturization of the "covered-wagon" drawn by oxen, as registered, is of the general pattern of similar pictures of "covered-wagons" frequently found in advertising and literature. The mark of the "covered-wagon" used by the defendant, while it might be differentiated in minor details, is still the picture of a "covered-wagon" drawn by oxen proceeding on the prairie. The motif of both marks is the same: an oxen-drawn covered wagon on the prairie. The mark used by plaintiff is as follows:

The mark used by the defendant is as follows:

2. There is an excellent mural of the covered wagon, somewhat similar to plaintiff's painting, in the lobby of the First National Bank of St. Louis. See Gabriel, The Pageant of America, Vol. 2 (Yale University Press 1929), p. 278.

The picturization of "covered-wagons" drawn across the prairies by oxen has been used in advertising both services and goods for more than half a century.[3] It is, of course, well known that the covered wagon was the means by which merchants, in movements south and west in early days, transported their wares, and families transported themselves and their possessions. It is sometimes referred to as a Conestoga wagon because it was said to have been manufactured at Conestoga, Pennsylvania, a town which took its name from an old tribe of Iroquois Indians who lived in the Susquehanna area. Others say that the Conestoga wagon was named after the breed of horses by which it was drawn. Some of the covered wagons have been referred to as Pittsburg wagons.[4]

However that may be, the covered wagon came into widespread use in the trek south and southwest over the Santa Fe trail and later across the prairies to the west.[5] As has been picturesquely stated, "the covered wagon, or 'prairie schooner' is perhaps the best single symbol of the great westward movement of the virile Anglo-Saxon race as it reached out with an irresistible demand for continental boundaries for the nation." [6]

Plaintiff has adopted and used the covered-wagon picturization to symbolize that it was a pioneer company in the insurance business.[7] Whether plaintiff's use of this symbolic mark entitles the mark to the trademark protection, sought in the first cause of action under the Lanham Act, is a novel question. The Lanham Act created, for the first time, federal substantive rights in registered trademarks and extended these rights to registered marks used in the sale or advertisement of services. Plaintiff's cause depends upon the scope of the protection Congress intended to afford by the Lanham Act. The Congressional intent must be considered against the background of the common law philosophy of trademark protection.

Trade-marks have always been regarded by the law as a means by which the seller seeks to distinguish his goods from those of another. A trade-mark

---

3. The evidence in this case discloses the use of such representations or picturizations by life insurance companies, title insurance companies, banks, insurance agencies and travel agencies, both before and after the effective date of the Lanham Act.

Travelers' Insurance Co. of Hartford, Connecticut and Pioneer Insurance Co. of Lincoln, Nebraska, are insurance companies using the covered wagon insignia, besides plaintiff and defendant.

As to railroad companies see United States News, April 10, 1953, p. 107.

As to banks, see Western Advertisers, vol. 56, No. 1, pp. 46, 64.

As to furniture, see The Pony Express, Placerville, California, February, 1953, p. 16.

As to games of chance, the billboards throughout the nation advertising Harold's Club, Reno, Nevada.

As to tobacco, the "Covered Wagon" cigar.

As to bread, "Covered Wagon" bread.

For a discussion of the degree of protection accorded commonly used marks by the common law, see Sunbeam Furniture Corp. v. Sunbeam Corp., 9 Cir., 1951, 191 F.2d 141.

4. See Rittenhouse, American Horse-Drawn Vehicles (Los Angeles 1948) p. 72; Vestal, Old Santa Fe Trail (Houghton Mifflin Co., Boston 1939) p. 36.

5. Gregg, Commerce of the Prairies, 1845; Vestal, Old Santa Fe Trail, supra note 4; Parrish, The Great Plains (A. C. McClurg & Co., Chicago 1907) p. 135; Paden, Wake of the Prairie Schooner (MacMillan Co., New York 1944); Hafen & Register, Western America (Prentice-Hall, New York 1941); Jackson, Wagon Roads West (University of California Press, Berkeley 1952).

6. Hunt and Ament, Oxcart to Airplane (Powell, Los Angeles 1929) p. 50.

7. For example, in an advertisement in The National Underwriter, for May 25, 1939, Plaintiff's Exhibit 43, it is stated that: "The 'Covered Wagon' is the copyrighted trademark of the Springfield Fire and Marine Insurance Company, Springfield, Mass., exemplifying well the pioneering spirit of the Company's founders. Chartered in 1849, the Springfield has grown steadily and conservatively."

has been treated as a right which is appurtenant to a business or trade in which the mark is employed or to the commodity with which it is identified. The right to the mark grows out of its use.

Today, a trade-mark performs a three-fold function: (1) to indicate origin; (2) to guarantee; and (3) to advertise and sell. Historically, the function of indicating origin was the first to develop. The trade-mark came to mean that a certain manufacturer made the goods that bore the mark. Today, the trade-mark still serves to indicate origin, but the identity of the origin is often unknown to the consumer. The mark merely indicates to him that goods bearing the mark come from the same origin, whatever that origin may be.

Later in their historical development, trade-marks took on the function of guaranteeing to the consumer that the quality of goods bearing the mark was the same as previous goods which bore the same mark.

As modern advertising developed, trade-marks assumed their third function of creating and perpetuating a market for goods through use of the advertising. Consumers are now induced to try a product because of the inherent appeal of the trade-mark used in advertising the product.[8]

The common law was originally shaped to protect trade-marks in their functions of indicating origin and guaranteeing quality to the consuming public. There was much discussion in the early cases as to whether protection was accorded a trade-mark merely to prevent the public from being deceived as to origin and quality, or also to prevent loss to the trade-mark owner of his market. The more recent cases have recognized that protection is afforded a trade-mark both for the benefit of the public and the trade-mark owner. The express purpose of the Lanham Act is to assure the trade-mark owner the advantages rightfully accruing to him from his use of the mark as well as to protect the public from deceit.[9]

Because a trade-mark performs none of its functions apart from its use in connection with the sale of goods or services, the common law did not protect a mark as a trade-mark unless it was *in fact in use.* It is clear that the Lanham Act did not change the law in this respect. Registration under the Act does not in itself constitute a grant of the exclusive right to control a mark. The mark must be in use as a trade-mark or service-mark to entitle it to registration under the Act, and it must remain in use in order to receive the protection afforded by the Act. Sections 1, 3, 14, 45.

The difficult question here is: what type of use is contemplated by the Act? At common law a mark was not protected as a trade-mark unless it was used by affixing it to goods on the market to indicate the origin of the goods. The philosophy of the common law was that a mark was not in need of protection unless it had become associated in the mind of the consuming public with a particular product. However, if a mark was the proper subject of a trade-mark and had been continuously used by affixing it to goods with the intention that the mark should indicate the origin of the goods, actual proof that the mark had been identified by the public with the goods apparently was not generally required to establish the validity of the mark as a trade-mark. As was stated in Kathreiner's Malzkaffee Fabriken, etc., v. Pastor Kneipp Medicine Co., 7 Cir., 1897, 82 F. 321, at page 326, adopting the language of an English case, "were it otherwise, and were the question to depend entirely on the time the mark had been used, or the reputation it had acquired, a very difficult, if not an in-

8. For excellent discussions of the nature and history of trade-marks, see Robert, The New Trade-Mark Manual (Bureau of National Affairs, Washington D.C.1947); Schechter, The Rational Basis of Trade-mark Protection, 40 Harvard Law Review 813 (1927).

9. House Report 219, Senate Report 1333, 79th Congress.

soluble, inquiry would have to be opened in every case, namely, whether the mark had acquired in the market a distinctive character, denoting the goods of the person who first used it." But, in cases where the sale of the marked goods were sporadic or few, or where it was not clear that the mark was affixed for the purpose of indicating origin, the mark was denied trade-mark protection in the absence of a showing that the mark had become associated with the goods in the mind of the consuming public. See for example, MacMahan Pharmacal Co. v. Denver Chemical Mfg. Co., 8 Cir., 1901, 113 F. 468, where in 10 years there had been but 362 sales of a drug marked "Antiphlogistine;" Kipling v. G. P. Putnam's Sons, 2 Cir., 1903, 120 F. 631, 65 L.R.A. 873, where a single edition of Kipling's works had been stamped with an ornamental device without any notice that it was intended as a trade-mark; Capewell Horse Nail Co. v. Putnam Nail Co., C.C.Mass.1905, 140 F. 670, where a check pattern was stamped upon nail heads but no public attention was called to it in the advertisements of the plaintiff nor upon its cartons; but compare the later case of Capewell Horse Nail Co. v. Mooney, C.C.N.D.N.Y.1909, 167 F. 575, where, upon other evidence, the court held the check pattern to be a valid trade-mark.

The Lanham Act has not significantly altered the common-law requirement that a trade-mark must be affixed to the goods which it identifies. The Act does permit the registration as trade-marks of marks used "or the displays associated" with goods. Section 45. But even this use necessitates a close physical association between the mark and the goods. Thus the Lanham Act preserves the requirement of actual physical association between trade-mark and goods which tends to assure that a mark which is accorded trade-mark protection ac-

tually performs its function of identifying the goods to the consuming public.

■ The common law did not afford trade-mark protection to marks used in connection with the sale of services because the mark could not be affixed to the services. Such protection as these marks received was accorded under the general principles of unfair competition. See e. g., Atlas Assurance Company v. Atlas Insurance Company, 1907, 138 Iowa 228, 112 N.W. 232, 114 N.W. 609, 15 L.R.A., N.S., 625. In extending trademark protection to service-marks, the Lanham Act does not specify any type of physical association that must exist between the service and the mark. The Act permits the registration, as a service-mark, of marks "used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others * *." Section 45. The Act goes on to specify that such service mark "includes without limitation the marks, names, symbols, titles, designations, slogans, character names, and distinctive features of radio or other advertising used in commerce." Section 45. This latter provision was intended primarily to protect the titles, theme songs, character names, and other distinctive features of radio programs. However, it is expressly not limited to radio advertising, although it was suggested at the Congressional committee hearings on the Lanham bill that it should be so limited.[10] The Lanham Act thus emphasizes the advertising and selling function of a service-mark.

During the Congressional committee hearings upon the Lanham Bill, there were complaints that the definition of service marks did not provide an adequate guide as to how a mark must be used to entitle it to protection as a service mark.[11] But, the Congress was in virgin soil. Those who participated in the drafting of the service-mark provi-

---

10. House Committee on Patents, Hearings on H.R. 102 and 5461, and S. 895, 77th Congress, 1st Session, pp. 170–177.

11. Hearings, House Committee on Patents on H.R. 102, H.R. 5461, S. 895, 77th

Congress, 1st Session, pp. 170–177, 228; House Committee on Patents on H.R. 4744, 76th Congress, 1st Session, p. 186; House Committee on Patents on H.R. 9041, 75th Congress, 3rd Session, p. 124.

sions apparently felt that, while service marks were entitled to some general protection, since there had been no previous experience with service marks, it was best to leave to future determination, the particular kind of marks which should receive statutory protection.[12] Thus it is that there is no definite guide to be found in the statute itself and that the marks entitled to protection will have to be determined by experience. In a sense, this leaves the door open to what has been sometimes called "judicial legislation."

■ Certainly there was justification for the complaints concerning the lack of a more specific description of service marks in the Lanham Act. Innumerable words or pictures used in the sale or advertising of a service might conceivably be embraced by the Act's sweeping definition. But, it is fairly obvious that every mark, or name, or phrase which an insurance company, or other similar service organization uses in its advertising, cannot be protected as a service mark. And, it is reasonably clear that the drafters of the service-mark provisions intended protection to be limited to those marks which perform the same functions in the selling of services that trademarks have traditionally performed in the selling of goods.[13] Thus the statutory protection must be limited to those marks which are used in such a way that they acquire an association with the service which enables them to perform a true trade-mark function.[14]

Since the variety of ways which an infinite number of marks might be used in the sale or advertising of a service is limited only by the ad-man's ingenuity, it cannot be assumed, as might be done in the case of a trade-mark, that a mark has acquired a service-mark association with a service, merely because it has been used for a considerable period. Whether plaintiff's mark is entitled to be protected by any of the remedies afforded by the Lanham Act depends upon whether the evidence establishes that those who deal with plaintiff, in fact, associate the covered-wagon mark with plaintiff's services in such a way that the mark performs a true service-mark function.

In my opinion, there is no evidence showing, nor any evidence from which an inference could be reasonably drawn, that the insurance brokers and agents, acting for their customers, associate in this manner the covered wagon-mark with the insurance services sold by the plaintiff.[15] The mark, when placed upon plaintiff's policies, does not serve to apprise the policyholder or the broker of the origin of the service, since the policy is merely a written statement of the contract already made. Nor does the mark serve to guarantee the quality of plaintiff's service since neither the policyholder nor the broker relies upon the mark as a guarantee of the contents of the policy, or of plaintiff's ability to abide by the contract.

Finally, the covered-wagon mark does not perform what is probably the most important function of a service-mark, the function of creating a market through its advertising appeal. The plaintiff, The Springfield Fire and Marine Insurance Company, is an old and well-known fire and marine insurance company. It is known by name, location, and character of service to the brokers and agents, who select insurance coverage for their customers. Only a vivid imagination could conjure the assumption that a bro-

12. Hearings, House Committee on Patents on H.R. 4744, 76th Congress, 1st Session, pp. 50–53; House Committee on Patents on H.R. 9041, 75th Congress, 3rd Session, p. 124.

13. Hearings, House Committee on Patents on H.R. 102, H.R. 5461, S. 895, 77th Congress, 1st Session, pp. 170–177.

14. For discussions of the functions of trademarks see, Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 6 Cir.1941, 119 F.2d 36; Robert, op. cit. supra, note 8. Schechter, supra note 8.

15. Compare the somewhat analogous trade-mark case, American Brake Shoe & Foundry Co. v. Alltex Products Corporation, 2 Cir., 1941, 117 F.2d 983, 984.

ker for a rice mill, for example, would buy fire insurance from the plaintiff because he associated in his mind the "covered wagon" mark with the insurance services of plaintiff. There is not the slightest evidence that any agent or broker has been so attracted by the picturization of the "covered-wagon" on any of plaintiff's advertising media that he sought plaintiff's services. The conclusion is inescapable that the evidence fails to show that the "covered-wagon" mark registered by plaintiff identifies its services and distinguishes them from the services of others in such a way as to perform any trade-mark function.

There is another and still more persuasive ground for denying injunctive relief to plaintiff. Assuming the validity of plaintiff's service-mark, the evidence has not established that the defendant's use of a similar mark has produced the consequences for which the statute provides equitable relief.

Section 32(1) of the Lanham Act provides that:

"Any person who shall, in commerce,

"(a) use, without the consent of the registrant, any reproduction, counterfeit, copy, or *colorable imitation* of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services *on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services;* or

"(b) reproduce, counterfeit, copy, or colorably imitate any such mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used upon or in connection with the sale in commerce of *such goods or services,*

shall be liable to a civil action by the registrant for any or all of the remedies hereinafter provided in this chapter, except that under subsection (b) of this section the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such mark is intended to be used to cause confusion or mistake or to deceive purchasers." (Emphasis supplied.)

It may be conceded that defendant's mark is a "colorable imitation" of plaintiff's mark within the meaning of the statute. Section 45 of the Act provides that "The term 'colorable imitation' *includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive purchasers.*" Although the word "colorable" might connote deliberate imitation with design to deceive, I do not believe it was employed in this sense in the statute. In my opinion the term is used here to mean a mark so similar in appearance to a registered mark that confusion would be likely, assuming that both marks are performing trade-mark functions in the same or related fields. This can be determined merely by a comparison of the two marks themselves.[16]

Plaintiff contends that it is entitled to injunctive relief under subsection (b) of section 32 of the Lanham Act, supra, merely upon the showing that defendant has colorably imitated its mark, and that it is unnecessary to show that defendant's use of the colorable imitation is "likely to cause confusion" as is required for relief under subsection (a). Defendant urges that injunctive relief can be granted under subsection (b) only against printers or publishers who perform the actual physical imitation. And, indeed, it appears that subsection (b) was intended to apply mere-

16. For discussion concerning the colorable imitation of trade-marks, see Walter Baker & Co. v. Delapenha, 3 Cir., 1908, 160 F. 746; Gordon's Dry Gin Co. v. Eddy & Fisher Co., D.C.R.I.1917, 246 F. 954; Rogers, Good-will, Trade-marks and Unfair Trading, 179.

ly to printers and other persons who actually perform the colorable imitation rather than to the user of the imitation. However, it is unnecessary to determine whether subsection (b) is so limited in its application. A careful reading of subsection (b) will demonstrate that for injunctive relief to be granted even under subsection (b), the colorable imitation must be applied to material to be used in selling services "in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such" services. This is so because the term "such goods or services" in subsection (b) refers back to the quoted clause in subsection (a).

Thus for relief to be granted plaintiff, it must appear that defendant's use of the similar covered-wagon mark is likely to cause confusion as to the source of origin of the services. There is no evidence of any actual instance of such confusion, nor any evidence of any instance from which an inference as to such confusion could be drawn. As was said by Justice Hand in Miles Shoes, Inc., v. R. H. Macy & Co., Inc., 2 Cir., 1952, 199 F.2d 602, 603, in the absence of such actual instances of confusion, "in the final analysis the decision must rest on the court's conviction as to possible confusion." The Court's conviction in this case is that there could not possibly be any confusion. Both the nature of the insurance business and the nature and character of the services sold by plaintiff and defendant, and their manner of operation, make it conclusively appear that it would not only be unlikely but completely improbable that the defendant's use of the covered wagon ornamentation would cause any broker or agent who had actual dealings with either plaintiff or defendant to believe that the two companies were in any way connected. For any broker who would select an insurance carrier because its policies or advertising material carried an imprint of a covered wagon, or a pine tree, or an elephant, would obviously soon be seeking his living in other fields.

This case, despite the interesting legal problem it has presented, really is "Much Ado About Nothing." The pleasure and pride of the plaintiff in the use of the ornamental picture of the covered wagon is understandable. But that is, per se, a far cry to granting judicial aid to stop another insurance company from using similar adornments or ornaments. In the absence of any evidence showing any confusion or likelihood of confusion, there is no need or cause for the drastic sanction of injunctive relief.

Judgment for defendant upon findings of fact and conclusions of law to be presented pursuant to the rules.