**REDDY COMMUNICATIONS, INC., Plaintiff,**

v.

**ENVIRONMENTAL ACTION FOUNDATION, Defendant.**

**Civ. A. No. 77–1105.**

United States District Court, District of Columbia.

July 17, 1979.

John T. Roberts, Irons & Sears, Washington, D.C., for plaintiff.

Hadrian R. Katz, Barry S. Sandals, Arnold & Porter, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

CORCORAN, District Judge.

### I. PRELIMINARY STATEMENT

In this action, the plaintiff Reddy Communications, Inc. (RCI), seeks to enjoin the defendant Environmental Action Foundation (EAF), from using RCI's service mark Reddy Kilowatt (Reddy) in EAF publications.

Plaintiff alleges service mark infringement, false designation of origin and unfair competition under common law and the Federal Trademark Act of 1946 (the Lanham Act), 15 U.S.C. § 1051 *et seq.*

EAF admits its use of Reddy, but contends that such use is legally proper.

By Memorandum and Order of November 11, 1977 the Court denied preliminary injunctive relief.

The case was tried to the Court, on the merits, on May 9, 10, 11, 14 and 15, 1979.

The Court concludes that RCI has failed to satisfy its burden of proving that EAF is infringing the plaintiff's service mark, and accordingly denies injunctive relief.

Pursuant to Fed.R.Civ.P. 52(a), the Court sets out below the findings of fact and conclusions of law relevant to its conclusion.*

## II. FINDINGS OF FACT

### A. *RCI and Reddy Kilowatt*

1. The plaintiff Reddy Communications, Inc. (RCI) is a Delaware corporation with its principal place of business in Connecticut. RCI provides advertising, public relations and communications services to investor-owned public utilities (investor utilities). It derives substantial income from the services provided.

2. RCI uses a stick figure, commonly called "Reddy Kilowatt' (Reddy), in conjunction with the corporate business.

3. Reddy was created by Ashton B. Collins (Collins) in 1926. It is best described as a humanized cartoon or stick figure composed of a body and limbs of jagged lines simulating lightning, a rounded head with a light bulb for a nose and electric outlets for ears, see Appendix A. Reddy is frequently pictured wearing rubber gloves and shoes, as worn by electric utility linemen for safety purposes.

4. Collins founded the company identified as Reddy Kilowatt Services (RKS) for the promotion of Reddy and related advertising services. RCI is the business successor to RKS. RKS and RCI have used Reddy continuously from 1926 to date.

5. RCI has registered Reddy as a service mark with the United States Patent Office (Patent Office) on four occasions pursuant to the provisions of the Federal Trademark Act of 1946 (the Lanham Act), 15 U.S.C. § 1051, *et seq.* The last registration was on September 2, 1969. As a consequence, RCI is the owner of all right, title and interest in and to service mark registration nos. 752,650; 769,300; 848,347; and 876,224.

6. The service mark registration of Reddy, number 752,650, bears the following description of Reddy's intended use: "Design and Formulation of Advertising and Public Relations Material to be used by Investor-Owned Public Utilities in promoting the sale of their services, in Class 101." Each succeeding registration has included a similar description.

7. RCI designs advertising material to be used by investor utilities which RCI selects as its clients. RCI also offers (1) publications and public relations material of its own creation and (2) articles and stories for use by its clients in their magazines and publications.

8. When used by RCI in sales to its client companies, Reddy stands for RCI's service of providing advertising materials, public relations services, consulting services and the like to its client companies.

9. In 1934 RKS began to license the use of its service mark Reddy to investor utilities of its own choosing. RCI continues the practice to date.

10. RCI currently has some 140 licensees, which are located in each of the fifty states except Nebraska. There is no licensee in Washington, D.C.

---

* At trial, the Court took under advisement the question of the admission of several of EAF's proffered exhibits. With reference to defendant's Exhibits 73, 74, 245, 246 and 247, the Court now concludes that the exhibits lack sufficient probative value as to the issues before the Court and consequently the Court denies their admission.

Additionally, the Court admitted into evidence defendant's Exhibits 166 through 237 and Exhibits 242, 243 and 244 subject to RCI's later objections. In the absence of sufficient objection and to provide a complete record, the Court admits the exhibits without reservation at this juncture.

Finally a controversy has arisen between the parties regarding EAF's reliance on portions of the deposition of Ashton Collins, Jr. not alluded to at the time of trial. The Court will admit into evidence both RCI's and EAF's post-trial designation of deposition testimony, with the exception of pages 569 and 570 of the Collins deposition which the Court finds to be irrelevant.

11. The contractual relationship between RCI and an individual licensee is governed by a licensing agreement (the license) entered into by the parties. RCI has used different licenses over the years. The current license was adopted in 1976. Prior versions were adopted in 1971, 1968, 1963, 1953, 1941 and 1934. See plaintiff's Exhibit 4.

12. The license describes the services RCI supplies the licensee. It also provides that the investor utility may use Reddy, but that such use must:

(a) meet generally accepted standards of good taste,

(b) contain only truthful and accurate information,

(c) be consistent with the objectives of investor-ownership in the electric utility industry,

(d) clearly identify the RCI licensee as the source of the material and allow for no confusion in the public mind in that regard,

(e) always represent REDDY KILOWATT as a genial, likeable, well-mannered, even-tempered representative of the RCI licensee. See plaintiff's Exhibit 4(c)–(g).

13. RCI's licensees use Reddy in all three phases of investor utility advertising *viz.* (1) promotional, (2) institutional, and (3) informational advertising. However, RCI's licensees are not in the business of selling advertising. Rather the investor utilities utilize advertising to promote the sale of their product, electric power, and in some instances gas and telephone services. RCI tells its licensees they may use Reddy to identify their electric services in their advertising directed to the buying public. See Reddy Design Guide, plaintiff's Exhibit 4(b), sheet 16 and Reddy Kilowatt Handbook of Trademark Usage, plaintiff's Exhibit 4(a), sheet 15.

14. The licensees use Reddy to identify themselves, as for example in a company signature, or in the body of an advertisement, or in a booklet. Reddy is also displayed at civic functions, in public displays at licensees' offices, at appliance shows and at state fairs.

15. Generally, the smaller RCI clients simply add their company names to material sent out by RCI, and then distribute that material through employee publications, newspaper advertising and other media. The larger licensees, guided and advised by RCI, usually design their own advertising materials utilizing Reddy therein.

16. One aid RCI provides to licensees in formulating advertising material is the Reddy Kilowatt Art Service Reproduction Proofs Catalogue. See defendant's Exhibit 321. The catalogue contains proofs of hundreds of poses of Reddy which RCI makes available to its licensees for reproduction in their advertising. These recommended poses of Reddy relate to such issues as burdensome utility taxes (sheet 1086), the need for rate increases (sheets 1128, 1132, 1158), promotion of all-electric homes (sheet 1140), promotion of electric water heating (sheet 1184), the need to increase the supply of electricity (sheet 1195), promotion of electric heat pump heating/air conditioning (sheet 1238), and encouraging support for fuel adjustment clauses (sheet 1240). The Art Service book also includes numerous uses of Reddy Kilowatt to stand for electricity running along transmission wires (sheet 1092), sitting in a shopping cart wearing a sign that says "bargain" (sheet 1142), being generated from coal (sheet 1272), the sun (sheet 1245), and atoms (sheet 1245), and emerging from electric outlets (sheet 1284). (All sheet references are to defendant's Exhibit No. 327).

17. In its current brochure issued to its licensees, "Reddy Communications, Inc. Counsel and Services," RCI indicates that Reddy may be used by the licensees in their advertising regarding the "six major issues facing the energy industry," *viz.* money, nuclear energy, energy supply and demand, environment, government power, and operations and public service. See plaintiff's Exhibit 3(d), sheet 6.

### (1) *RCI Publications*

18. RCI sells five books and a quarterly pamphlet "Energy Dialog" directly to the

public. The "Energy Dialog" identifies Reddy as a trademark, while the books do not.

19. RCI also publishes comic books and produces motion pictures. These items are sold to RCI's licensees which, in turn, distribute the comic books and show the motion pictures to schools, civic clubs and the like.

20. RCI makes use of Reddy in its own publications, as for example: (1) in RCI's comic book "Color it Conserved" Reddy is identified as the investor utilities' symbol for their product electricity, see plaintiff's Exhibit 3(a)(1); (2) in RCI's comic book "The Mighty Atom" Reddy is identified as a trademark and is characterized as portraying the power of electricity, see plaintiff's Exhibit 3(a)(2); and (3) in the "Wizard of Light" Reddy is identified as a trademark, see defendant's Exhibit 120.

21. The motion picture "The Mighty Atom" was shown at trial and its content is similar to that of the comic book by the same name. See plaintiff's Exhibit 3(a)(2) and defendant's Exhibit 324.

B. *Environmental Action Foundation*

22. Defendant, Environmental Action Foundation (EAF) is a non-profit corporation incorporated in the District of Columbia in 1971. It has a Coordinator and a Board of Directors which supervises the EAF staff.

23. EAF characterizes its function as researching and educating the public about environmental issues. To that end, it is organized into several projects, one of which is the Utility Project coordinated by Richard E. Morgan. The conduct of Utility Project is the basis for this lawsuit.

(1) *EAF Publications*

24. The Utility Project publishes and sells to the public, books and magazines wherein caricatures of Reddy appear. The Project identifies each of the publications as authored by EAF, see plaintiff's Exhibit 10. The publications consist of commentary on political, economic, social and environmental issues, upon which readers often rely for factual information. The publica-

tions do not resemble the advertising produced by investor utilities or the public relations materials furnished by RCI to its licensees.

25. EAF's publications are distributed almost exclusively through the mails. EAF receives a written order for one of its books or for a subscription to one of its magazines usually with prepayment, and sends the book or magazine by mail. EAF only serves a specific clientele of people who are knowledgeable about and interested in electric utility companies. EAF does not serve the general public with its publications.

26. Of particular importance to this suit is the EAF monthly newsletter the "Power Line" which has some 2000 subscribers. 50 are citizens action groups, 80 are nationally recognized newspapers, 28 are news services, 13 are radio and television networks and stations, and 10 are nationally circulated magazines. See plaintiff's Exhibit 9, pp. 59–86.

27. EAF publications, most notably the "Power Line," include cartoon illustrations for the purpose of quick understanding of complex issues. The illustrations are intended as parodies to accompany the text and to be assimilated by the reader with the text as a whole. Some of EAF's cartoons are understandable in themselves, while others are used as graphic, satirical images of points made in the text.

(2) *EAF's Use of Reddy*

28. In March, 1974, EAF published a pamphlet "How to Challenge Your Electric Utility" wherein it included for the first time four caricatures of Reddy. See plaintiff's Exhibit 9, pp. 1–4. Thereupon RCI notified EAF that it viewed the publication of such Reddy caricatures as a violation of its trademark rights. See Exhibit 9, pp. 5–9.

29. In June, 1976, EAF published a pamphlet "Taking Charge: A New Look at Public Power" which contained eight caricatures of Reddy. See plaintiff's Exhibit 9, pp. 14–20.

30. During the period October, 1976, until February, 1979, EAF at various times

published caricatures of Reddy within illustrative cartoons in the "Power Line." EAF also used one particular caricature of Reddy (see Appendix B) as the logo for the "Static Column" which appeared in the "Power Line" fourteen times from December, 1976, to July, 1978. See plaintiff's Exhibit 9 at pp. 22, 24, 25, 27, 29, 31, 37, 39, 41, 42, 45, 46, 48 and 51.

31. In total, between March, 1974 and February, 1979, EAF published Reddy caricatures some 58 times in its books and the "Power Line."

32. In its publications, EAF does not use the Reddy caricatures to symbolize electricity or EAF. Rather the Reddy caricatures have been used to identify (1) the electric utility industry in general, (2) specific investor utilities and (3) groups of investor utilities. In most instances, EAF appears to use Reddy caricatures to portray the electric utility industry in a negative light.

33. On February 28, 1979, the EAF Board passed a resolution concerning the usage of Reddy Kilowatt by its staff. The resolution stated that Reddy was to be used "only to stand for investor-owned utility companies that utilize the same figure to stand for themselves." See defendant's Exhibit 253.

## C. *The Harris Survey for RCI*

34. Nicholas Tortorello, Senior Vice-President of Louis Harris and Associates, formulated and supervised, at RCI's behest, the conduct of a public opinion survey concerning its service mark, Reddy. Only one of the previous 300 surveys Tortorello had worked on involved a trademark.

35. The survey entailed personal interviews with a random sample of 1500 Americans 18 years and older. Tortorello testified that such a sampling would predict what the entire American adult population is thinking, within a margin of error of three percent, plus or minus.

36. No member of the Harris survey was a reader of EAF publications. (Trial Transcript pp. 274–275). None of the interviewees were shown any EAF publication either in whole or in part during the course of the interview. Tortorello structured the survey in this manner because in a "pretest" Tortorello had found that when the interviewees were shown Reddy in the context of an EAF article, they reacted more to the story line than to the Reddy figure.

37. A brief description of the relevant portion of the Harris survey follows.

One half of the survey sample (Group I) was shown Reddy, as the service mark appears in the publications of RCI and its licensees (see Appendix A), and was asked:

Here is a picture of a figure which is used for representing something. Look closely at the picture and tell me what you think the figure is supposed to represent. Anything else? [the Recognition Question]

The respondents' answers are detailed in Appendix C.

At a later point in the interview, Group I was shown an image of Reddy which was used as the logo for the Static Column in EAF's "Power Line". (See Appendix B). Group I was again asked the Recognition Question and responded as shown by Appendix D.

Finally Group I was asked whether they thought the two figures originated from the same organization. Their responses are shown in Appendix E.

The other half of the survey sample (Group II) was first shown the Appendix B image of Reddy and asked the Recognition Question. Their responses are in appendix F.

Later the Appendix A Reddy was shown to them and the Recognition Question was again posed. Their responses are set forth in Appendix G.

Lastly Group II was asked whether they felt the two images originated with the same organization. Appendix H contains their responses.

38. The figures that appear in Appendices A and B, and used as described above in the Harris survey, are fundamentally the same figure. (Trial Transcript p. 303). The two cards on which the figures were imprinted were about the same size, the fig-

ures on them were drawn the same size, in the same color, in the same position and in the same physical format.

39. The amount and kind of information provided to a respondent in a survey is a major determinant of whether accurate information will be obtained. The Harris survey stripped away many elements of information relevant to EAF's use of Reddy.

40. The Harris survey demonstrates that the Reddy cartoon figure is associated by the public, among other things, with (1) electricity, (2) specific utility companies, (3) electric utility companies in general, and (4) the Reddy Kilowatt name itself.

## III. CONCLUSIONS OF LAW

### A. *Infringement*

#### 1. *Nature of a Service Mark*

■ The observations of Mr. Justice Frankfurter on the role played by trademarks in our economic system are equally applicable, in the Court's view, to service marks:

> The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress.[1]

Congress provided statutory protection for marks in the Federal Trademark Act of 1946 (the Lanham Act) 15 U.S.C. § 1051 *et seq.* Under the Lanham Act, the term trademark "includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127. In the same section a service mark is defined as a "mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others." In practice, no consequential difference exists between trademarks and service marks:

> Service marks might just as well have been called trade marks for services, leaving conventional trade marks to be referred to as trade marks for goods, but the different term is probably more convenient . . . Inasmuch as a service mark is not used with goods, it obviously can not be attached to the goods as is a trade mark for goods, and hence a service mark is used when it is used or displayed in the sale or advertising of the services. In addition, the definition of service mark offers a greater variety of possible marks than is the case with trade marks for goods. *Aside from these differences, the trade mark sections [of the Lanham Act] and the various provisions thereof apply to service marks, that is, to trade marks for services, as they do to trade marks for goods.*[2]

■ Accordingly, identical standards govern the determination whether a trademark or a service mark has been infringed. 15 U.S.C. § 1053; *Boston Pro. Hockey Ass'n v. Dallas Cap & E. Mfg., Inc.,* 510 F.2d 1004, 1009 (5th Cir. 1975) *cert. denied* 423 U.S. 991, 96 S.Ct. 408, 46 L.Ed.2d 312 (1975); *see West & Co., Inc. v. Arica Institute, Inc.,* 557 F.2d 338, 340 n. 1 (2d Cir. 1977); *Mr. Travel, Inc. v. V.I.P. Travel Service, Inc.,* 268 F.Supp. 958, 961 (N.D.Ill.1966), *aff'd* 385 F.2d 420 (7th Cir. 1967).

---

**1.** *Mishawaka Rubber and Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942).

**2.** *Ex Parte Belnap & Thomson, Inc.,* 90 U.S.P.Q. 123, 125 (1951) (emphasis supplied).

■ The owner of a service mark has standing to complain when another infringes upon any of the functions generally attributed to such a mark *viz.* (1) as an indicator of the origin of the services which the mark represents; (2) as a guarantee of the quality of the services; or (3) as a medium for advertisement. *See generally* 3 R. Callman, Unfair Competition, Trademarks and Monopolies, § 66.3, at 36 (3d ed. 1967).

■ Because a service mark is in simplest terms an identification tool, it must perform the same functions in the selling and advertising of services that a trademark traditionally performs in respect of goods. *See* 3 Callman, *supra,* § 68.1, at 71. Consequently, a true service mark cannot be merely attractive or ornamental, but it must be used in such a way that it acquires an association with the services, performed by its owner, which it is intended to represent. *Liberty Mutual Insurance Co. v. Liberty Ins. Co. of Tex.,* 185 F.Supp. 895 (E.D.Ark.1969); *see Miss Universe, Inc. v. Patricelli,* 271 F.Supp. 104 (D.Conn.1967); *Springfield Fire and Marine Ins. Co. v. Founders F. & M.I. Co.,* 115 F.Supp. 787 (N.D.Cal.1953); *In re Universal Oil Products Company,* 167 U.S.P.Q. 245 (TT&A Bd., 1970); Hearings, House Committee on Patents on H.R. 102, H.R. 5461, S. 895, 77th Congress, 1st Session, pp. 170–177.

## 2. *The Reddy-Kilowatt Service Mark*

In light of the above, a threshold question is presented namely, what are the precise services represented by RCI's service mark, Reddy Kilowatt, (Reddy)?

In its several registrations of Reddy with the Patent Office, RCI proffered, pursuant to the requirements of 15 U.S.C. § 1051(a), that Reddy represents RCI's corporate services consisting of the "[d]esign and formation of advertising and public relations material to be used by investor-owned public

utilities in promoting the sale of their services . . . ." [3] Thus, RCI does not offer its promotional services to the general public, but only to investor-owned public utilities [investor utilities], and more specifically, it offers services only to those investor utilities which enter into licensing agreements with it.

■ A most noteworthy feature of RCI's licensing agreements [4] is the language whereby RCI permits its licensees to use Reddy in "all forms of utility company messages to customers, employees, special and general publics in all media, printed releases, direct mail, bulletin boards, signs and other forms of identification, advertisements . . . ." [5] The Lanham Act sanctions such licensing arrangements but only where the licensees of the service mark are related companies, i. e. where the owner of the service mark controls the licensees as to "the nature and quality of the goods or services in connection with which the mark is used." [6]

The parties advance differing interpretations and applications of the phrase "nature and quality of the services with which the mark is used" and it is those differing views which are the core of the present controversy.

RCI argues, in substance, that when Reddy is used by its licensees, Reddy represents those advertising services—specifically promotional, institutional and informational advertising—which the investor utilities provide to their customers. RCI further contends that by including in its licensing agreements clear standards concerning the physical appearance of Reddy and the contexts in which Reddy may be used [7] it exerts sufficient control over those advertising services to satisfy the requirements of the Lanham Act.

To the contrary, EAF asserts that because RCI's licensees, over the past forty

---

**3.** Plaintiff's Exhibit No. 1, Sections A through D, *see* Findings of Fact 5 & 6.

**4.** Plaintiff's Exhibit No. 4.

**5.** Plaintiff's Exhibit No. 4, Section C, p. 2.

**6.** 15 U.S.C. § 1127. *See* 15 U.S.C. § 1055.

**7.** See Finding of Fact 12.

years, have fully availed themselves of the permitted uses of Reddy enumerated above, Reddy has come to represent in different contexts (1) individual licensees of RCI; (2) the product that the licensees provide, i. e. electricity; and (3) not only the advertising services of the licensees but all the many and varied services related to the production and supply of electricity. Further, EAF contends that RCI does not impose quality standards on its licensees as to production and supply of electricity and thus fails to meet its statutory duty under the Lanham Act to control the services of the licensees.

### 3. *The Alleged Infringement by EAF*

■ The gravamen of RCI's complaint is that EAF, by casting Reddy in a negative light as the "villainous utility company" in its publications, has reduced Reddy's attractiveness to investor utilities as a public relations tool for promotion of the utility industry. In addressing RCI's thesis, we assume for purposes of argument the validity of RCI's contention that Reddy represents the advertising services provided by the licensees to their customers.[8]

8. Contrary to the assumption, the Court believes that use of Reddy by the licensees clearly exceeds the limits of use described in the Patent Office registrations of Reddy which state in essence that Reddy is to represent *RCI's* service of providing public relations aid to investor utilities. Conspicuously absent from that characterization is any reference to the advertising service by the utilities to *their* customers. And the record reflects as well that, in practice, Reddy, as used by the licensees, does not function to identify, in the public's mind, services offered to the general public by RCI, the registered owner of the mark. (See Appendices C through H detailing the results of the Harris Survey, *but see Reddy-Kilowatt v. Mid-Carolina Electric Cooperative,* 142 F.Supp. 851 (E.D. S.C.) *aff'd* 240 F.2d 282 (4 Cir. 1957)). To the contrary the record fully supports the conclusions that Reddy has instead come to symbolize (1) the individual investor utilities who employ Reddy in their advertising and (2) the generation and supply of the utilities' product, electricity. This is not to say that Reddy has become in any sense a generic symbol for electricity, or that Reddy represents a specific quality level of electric service. In particular the applicability of the generic symbol principle in this context appears highly doubtful. It is sufficient, however, to find that Reddy has come to trigger in the public's mind associations with

To prevail in that setting RCI must shoulder the burden of proving each of five elements deemed essential in the typical infringement case, *viz*: (1) use of an imitation of the mark, (2) without the consent of the mark's owner, (3) in commerce, (4) in connection with the sale of services and (5) which is likely to cause confusion, or to cause mistake or to deceive. *Boston Pro. Hockey Ass'n, supra see* 15 U.S.C. § 1114, *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664, 668 (2d Cir. 1968).

It is clear that RCI has not carried its burden as to these essential elements of infringement.[9]

EAF readily admits that it has used imitations of Reddy (although in a very unflattering manner) in publications sold to the public and thus in commerce, and it is equally clear that RCI has never consented to such commercial uses by EAF.

But RCI has not established the other required elements. It has not shown (1) that EAF uses Reddy in connection with the sale or offering for sale, or distribution, or advertising of any goods or services and

electricity and the investor utilities. This conclusion merely attests to EAF's astuteness in selecting Reddy for its parodies of the utilities.

9. Although direct competition is not *sine qua non* of service mark infringement, *Professional Golfers Ass'n of America v. Bankers L. & C. Co.,* 514 F.2d 665 (5th Cir. 1975); *Beef/Eater Restaurants, Inc. v. James Burrough Limited,* 398 F.2d 637 (5th Cir. 1968), the total absence of competition between the parties is a fact of some significance. The record indicates that EAF in no way competes with either RCI or the investor utilities in providing advertising or public relations services.

It is also significant that the Lanham Act does not contain language found in some state "anti-dilution" laws. See for example New York General Business Law § 368–d which provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark for trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

(2) that confusion has been created by the EAF use of the Reddy mark.

Insofar as sale of services is concerned, RCI has demonstrated that EAF uses caricatures of Reddy in its publications, but the record reflects as well that in most instances EAF's caricatures appear only in the body of its publications and merely serve as illustrative cartoons complementing the surrounding text. Beyond that, RCI has failed to demonstrate that EAF has used Reddy to identify or promote the sales of EAF publications. And because we believe the record sufficiently supports an inference that readers of EAF's publications are interested in those publications more for EAF's substantive comments than for its parodies, the Court concludes that EAF's use of Reddy is merely incidental to the sales of its publications.

But even if we err in that conclusion, it is still incumbent upon RCI to prove that EAF's use of Reddy is likely to cause confusion, or to cause mistake, or to deceive.

█ The ultimate test of infringement is whether the use of the allegedly infringing mark is likely to confuse consumers as to the services represented by the mark. *T.G.I. Friday's Inc. v. Intern. Restaurant Group*, 569 F.2d 895, 899 (5th Cir. 1978); *see Carter-Wallace Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800 (9th Cir. 1970); *Dart Drug Corporation v. Schering Corporation*, 116 U.S.App.D.C. 23, 320 F.2d 745, 748 (D.C. Cir. 1963); *Marquis Who's Who v. North American Ad. Assoc.*, 426 F.Supp. 139, 142 (D.D.C.1976), *aff'd* 187 U.S.App.D.C. 426, 574 F.2d 637 (1978). Trademark infringement occurs only when the use sought to be enjoined is likely to confuse purchasers with respect to such things as the source of the service, its endorsement by the plaintiff, or its connection with the plaintiff. *Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 388 (5th Cir. 1977). It follows then that the plaintiff must prove that the public [10] is likely to confuse the services of

plaintiff and defendant. *See Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326 (6th Cir. 1973) *cert. denied* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973); *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457 (3rd Cir. 1968); *Mr. Travel v. V.I.P. Travel Service, Inc.* 268 F.Supp. 958 (D.C.1966), *aff'd* 385 F.2d 420 (7th Cir. 1967).

The Court in *Kentucky Fried Chicken, supra*, at p. 389 observed:

Our [Fifth Circuit] cases demonstrate unbroken insistence upon *likelihood of confusion*, and by doing so they reject any notion that a trademark is an owner's 'property' to be protected irrespective of its role in the operation of our markets. [citation omitted]. Trademarks convey to purchasers a variety of information, and when a competitor's use of the same or similar mark interferes with this informational function, trademark infringement is established. (emphasis supplied).

In the traditional service mark setting, the likelihood of confusion is weighed according to the following factors:

(a) the degree of resemblance between the designation and the other's trade name, trademark or certification mark in

    (i) appearance;

    (ii) pronunciation of the words involved;

    (iii) translation of the words involved;

    (iv) verbal translations of the pictures or designs involved;

    (v) suggestiveness, connotation or meaning of the actor's designation and the trade name, trademark or certification mark involved;

(b) the intent of the actor in adopting and using the designation;

(c) the similarity of circumstances and conditions surrounding the purchase of the goods or services involved;

10. With regard to RCI's public relations services alone, its "public" is limited to the present and prospective licensees of its services. As those investor utilities are the very subject of EAF's parodies, they are well aware of the existence of EAF and its use of Reddy. Consequently the Court will consider only the lay public's perception of Reddy as used by EAF.

(d) the degree of care likely to be exercised by purchasers of the goods or services involved.

Restatement of Torts 2d § 729; *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173 (2d Cir. 1976); *Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.*, 452 F.Supp. 429, 444 (W.D. N.Y.1978); *Motor Master Products Corp. v. Motor Masters*, 446 F.Supp. 165, 168 (E.D. Pa.1978); *Marquis Who's Who v. North American Ad. Assoc.*, 426 F.Supp. 139 (D.D. C.1976), aff'd 187 U.S.App.D.C. 426, 574 F.2d 637 (1978).

RCI does argue that EAF's caricatures of Reddy create a likelihood of confusion to the public as to who originates, sponsors or permits such caricatures. To support its contention, RCI relies in main on the results of the Harris Survey described in the Findings of Fact 34–40 and Appendices C–H.

■ While the results of surveys are generally deemed to be of probative value in infringement cases, and thus admissible, the Court, as trier of fact, must decide the weight to be accorded a particular survey in light of the evidence adduced. *See Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976), *cert. denied* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975); *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445 (5th Cir. 1973). For reasons which follow, we conclude in this instance that the Harris Survey is deficient in its methodology and that its findings provide little support for RCI's claim of confusion. *See E.I. Dupont de Nemours & Co. v. Yoshida Internat'l, Inc.*, 393 F.Supp. 502, 518 (D.N.Y. 1975).

■ In assaying the potential for confusion between two marks by interviewees of a survey, the interviewees should not be presented the marks in a "simple, visual, side by side comparison," but rather "the mark and the imitation should be viewed 'in light of what occurs in the market place' . . . taking into account the 'circumstances surrounding the purchase of the

goods'." *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 759 (9th Cir. 1978); *see generally James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976).

As detailed in Finding of Fact 37, the interviewees in the Harris Survey were shown two illustrations of Reddy (Appendices A & B) in a context devoid of any background information and totally foreign from the usual manner in which the public would come in contact with either of the figures.

The interviewees were not made aware of the nature of the publications in which EAF's caricatures appeared, the surrounding text of the publications, or the channels by which the publications are circulated.

■ As the two illustrations of Reddy would appear similar, in the Court's view, to the casual observer, the difficulty experienced by the Harris sample in discerning the different authorship of the two Reddy figures is not unexpected. Consequently, the failure to present EAF's caricatures of Reddy in a context reasonably resembling the empirical reality of EAF's use of Reddy seriously undermines the probative value of the survey data.

The Harris survey also failed to account for the specific public exposed to EAF publications. Indeed, the Harris survey, in all likelihood, did not include one actual reader of EAF publications. The survey ignored the significant fact that none of EAF's publications are distributed or sold in the public marketplace where uninformed or easily gullible readers might be exposed to them. Rather, EAF publications can only be secured through the mails by an individual's specific request. Consequently, the consumer is required to have some preliminary knowledge as to the source of the publications before he can obtain a copy. Thus we do not deal here with the admittedly greater problem of the uninitiated reader simply purchasing a copy of an EAF publication from a corner news stand.

Lastly a brief perusal of the subscription list to EAF's publication, the "Power Line" reveals that a significant number of its readers are individuals and organizations generally thought to be sophisticated in dealing with issues presented by EAF and the journalistic manner of that presentation.

Against the backdrop then of what the Court deems inconclusive results of the Harris survey, the Court must make its own independent determination as to the likelihood of confusion. *See Beef/Eater Restaurants Inc. v. James Burrough Limited*, 398 F.2d 637 (5th Cir. 1968); *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619 (5th Cir. 1963); *Marquis Who's Who v. North American Ad. Assoc.*, 426 F.Supp. 139 (D.D.C.1976), aff'd, 187 U.S.App.D.C. 426, 574 F.2d 637 (1978). After review of the caricatures of Reddy as used by EAF *within the context of its publications*, the Court concludes: (1) that EAF's caricatures are dissimilar from Reddy in connotation and overall impression; (2) that the EAF publications are obtained by careful, sophisticated purchasers who will view the EAF caricatures not in isolation but in conjunction with the surrounding text; and (3) that the surrounding text and other identifying indicia adequately signal to the reader the critical use being made of Reddy by an opponent of the electric utility industry.

In sum, RCI has failed to persuade the Court that there exists a sufficient potential for confusion as to the origin or sponsorship of EAF caricatures of Reddy.

### 3. Unfair Competition and False Designation of Origin

■ The tort of unfair competition is the law's recognition of the mark principle that no one shall sell his goods in such a way as to make it appear that they come from some other source. *Boston Pro. Hockey Ass'n, supra* at 1010.

The gravamen of an action to enjoin unfair competition rests in a showing that the defendant is passing off his goods or services as those of the plaintiff by virtue of a substantial similarity between the two, resulting in confusion on the part of potential customers. *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474 (5th Cir. 1974); *see generally Professional Golfers Ass'n of America v. Bankers L. & C. Co.*, 514 F.2d 665 (5th Cir. 1975); *Boston Pro. Hockey Ass'n, supra; Baker v. Simmons Co.*, 307 F.2d 458 (1st Cir. 1962).

■ The Lanham Act prohibits as well the false description of goods or services. 15 U.S.C. § 1125(a). A cause of action arises under that section when the defendant's mark is likely (1) to cause confusion; (2) to deceive purchasers into believing the source of origin of goods or services is in another than the plaintiff; or (3) to impart a false impression regarding the character or nature of the plaintiff's services. *See* 1 R. Callman, Unfair Competition, Trademarks and Monopolies, § 18.2(b), at 622–623 (3d 1967); *Hesmer Foods, Inc. v. Campbell Soup Co.*, 346 F.2d 356 (7th Cir. 1965); *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641 (3rd Cir. 1958); *National Lampoon, Inc. v. American Broadcasting Cos. Inc.*, 376 F.Supp. 733 (S.D.N.Y.1974); aff'd 497 F.2d 1343 (2nd Cir. 1974).

■ Our conclusion *supra* that RCI has failed to demonstrate sufficient likelihood of confusion or deception of the public to establish trademark infringement is equally applicable here. Consequently, we hold that no adequate showing of unfair competition or false designation has been made by the plaintiff.

## IV. ORDER

Accordingly, for the reasons set out above, it is this 17th day of July, 1979,

ORDERED that the prayer of the plaintiff, Reddy Communications, Inc., for permanent injunction against the defendant, Environmental Action Foundation, should be, and the same is hereby, denied, and judgment is entered in favor of the defendant, Environmental Action Foundation as to plaintiff's complaint.

# APPENDIX  A

SHOW CARD "A"                    STUDY NO. 7881

## APPENDIX B

SHOW CARD "B"                    STUDY NO. 7881

## APPENDIX C

Q.A1 — WHAT DO YOU THINK THIS FIGURE IS SUPPOSED TO REPRESENT? (COL 115-117)
FIGURE "A"

| | | REGION | | | | AREA | | | | | AGE | | | EDUCATION | | | TYPE OF WORK | | |
| | | | | | | | | | | | | | 50 | 8TH | | | | | SKIL WH- -LED ITE | | |
| TOTAL | EAST | MID- WEST | SO- UTH | WEST | CI- TIES | OTHER FIVE | SUB- SIX | TO- URBS | RU- WNS | 18- RAL | 30- 29 | & 49 | OVER | GR- ADE | HIGH SCH | COL- LEGE | PROF | EXEC | LA- BOR | COL- LAR | UNION MBR |
| HIGHER PRICES/ RAISED COSTS | 1% | 1% | 1% | * | 2% | 2% | 4% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 2% | * | 1% | 1% | 1% | 2% | 2% |

| | TOTAL | EAST | MID-WEST | SO-UTH | WEST | CI-TIES | OTHER FIVE | SIX | SUB-URBS | TO-WNS | RU-RAL | 18-29 | 30-49 | 50 & OVER | 8TH GR-ADE | HIGH SCH | COL-LEGE | PROF | EXEC | SKIL-LED LA-BOR | WH-ITE COL-LAR | UNION MBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDEA/BRAINSTORM EXPRESSION | 1% | 1% | 1% | 1% | 2% | 2% | - | 5% | 2% | - | 1% | 2% | 1% | 1% | - | 1% | 2% | 2% | - | 2% | - | 3% |
| FUNNY FACES/MAKING FUN/GOOFING OFF | 1% | * | 2% | 1% | 1% | 2% | - | -- | 1% | - | 1% | 2% | 1% | * | 1% | 1% | 1% | - | -- | 1% | - | -- |
| POWER CO MAKING FUN/LAUGHING AT PUBLIC | 1% | 1% | 1% | 1% | -- | 2% | 10% | - | - | 1% | - | 1% | 1% | 1% | 2% | 1% | -- | -- | -- | 1% | 3% | 1% |
| CLOWN/JACK-IN-THE-BOX/CLOWN FACE | 1% | 1% | 1% | 1% | - | 2% | 10% | - | * | 1% | - | 1% | * | 1% | 1% | 1% | - | - | 1% | * | 1% | - |
| SOMEONE SHOCKED BY ELECTRICITY/SOMEONE WHO HAS JUST GOT A SHOCK | 1% | 1% | - | 2% | - | 1% | -- | - | 1% | 1% | - | 1% | * | 1% | 3% | 1% | - | - | - | 1% | - | * |
| DEVIL/DEMON | 1% | 1% | - | 1% | 2% | 2% | - | - | 1% | -- | - | 1% | * | 1% | 1% | 1% | - | - | 1% | 1% | 1% | - |
| NOTHING | 1% | - | 1% | 1% | 1% | * | - | - | 1% | - | 1% | 1% | * | 1% | 1% | * | 1% | - | 1% | 1% | - | 1% |
| PUBLIC SERVICE CHARACTER | 1% | - | 1% | * | 1% | 1% | - | - | 1% | - | 1% | * | 1% | * | - | 1% | * | - | 1% | 1% | 1% | 1% |
| NUTTY/WACKY/WEIRD PERSON | 1% | - | 1% | * | - | - | - | - | 1% | - | 1% | 1% | * | - | - | 1% | 1% | - | - | 1% | - | - |
| POWER CO TELLING PUBLIC:GOTCHA WHERE WE WANT YOU/CALLING PUBLIC SUCKERS | * | * | 1% | - | - | - | - | - | 1% | -- | 1% | - | 1% | - | 1% | - | - | - | 1% | - | - | - |
| STUPID/SILLY/FOOLISH | * | 1% | - | - | - | . | 1% | - | - | - | - | - | - | - | 1% | - | * | - | 1% | - | 1% | - |
| CLOSED EARS/DOESN'T WANT TO HEAR/DEAF | * | - | * | * | - | - | - | - | - | - | 1% | - | * | * | 1% | - | - | - | - | - | 1% | - |
| STICKING OUT TONGUE | * | * | - | - | - | - | - | - | - | - | 1% | - | * | - | 1% | - | - | - | - | * | - | - |
| (PUBLIC) MAKING FUN OF/CRITICISING POWER COMPANIES | * | - | - | * | - | * | - | - | - | - | -- | - | - | * | 1% | - | - | - | - | * | - | - |
| ELECTRICITY | 38% | 36% | 37% | 33% | 49% | 44% | 30% | 33% | 36% | 33% | 35% | 41% | 40% | 33% | 28% | 37% | 42% | 44% | 44% | 36% | 33% | 43% |
| LIGHT BULB, LIGHT | 15% | 20% | 11% | 13% | 13% | 15% | - | 25% | 21% | 6% | 13% | 14% | 19% | 12% | 10% | 18% | 12% | 12% | 11% | 15% | 16% | 19% |
| REDDY KILOWATT/KILO-WATT MAN/JOHNNY KILOWATT | 14% | 13% | 14% | 15% | 11% | 8% | 17% | 4% | 15% | 20% | 15% | 7% | 16% | 16% | 9% | 10% | 21% | 29% | 13% | 13% | 8% | 14% |
| ELECTRIC/UTILITY CO | 13% | 15% | 16% | 12% | 7% | 10% | 8% | - | 15% | 14% | 15% | 13% | 13% | 10% | 12% | 15% | 15% | 10% | 15% | 15% | 19% | 15% |
| ELECTRIC/UTILITY CO SPECIFIC (IE-PACIFIC, CAROLINA, WESTINGHOUSE) | 10% | 10% | 11% | 7% | 14% | 5% | 12% | 3% | 12% | 15% | 11% | 12% | 10% | 9% | 10% | 8% | 14% | 13% | 17% | 10% | 6% | 11% |
| SYMBOL FOR ELECTRIC/ENERGY/ELECTRIC CO | 10% | 10% | 12% | 10% | 5% | 10% | 27% | 14% | 9% | 10% | 10% | 11% | 12% | 6% | 3% | 8% | 15% | 14% | 12% | 9% | 8% | 11% |
| ENERGY/POWER | 9% | 10% | 7% | 8% | 13% | 8% | 7% | 16% | 10% | 8% | 9% | 11% | 9% | 7% | 6% | 8% | 11% | 12% | 8% | 8% | 10% | 8% |
| WASTING ENERGY/USING TOO MUCH ENERGY/CONSERVE | 7% | 12% | 5% | 3% | 10% | 7% | 10% | 5% | 9% | 2% | 8% | 10% | 8% | 4% | 3% | 6% | 10% | 9% | 6% | 6% | 6% | 11% |
| HAPPY/PLEASED/OVER-JOYED PERSON | 4% | 4% | 3% | 3% | 9% | 4% | 18% | - | 5% | 2% | 4% | 2% | 4% | 6% | -- | 5% | 4% | 2% | 6% | 6% | 1% | 5% |
| ADVERTISEMENT/COMMERCIALS/POWER CO. ADS | 4% | 5% | 2% | 2% | 6% | 4% | - | - | 6% | 1% | 2% | 3% | 4% | 4% | 2% | 3% | 5% | 5% | 3% | 4% | 4% | 5% |
| MAN/LITTLE MAN/ELECTRIC MAN | 4% | 3% | 3% | 5% | 3% | 2% | - | - | 4% | 6% | 4% | 5% | 4% | 3% | 1% | 4% | .4% | 4% | 4% | 5% | 4% | 4% |
| CARTOON/COMIC CHARACTER | 3% | 2% | 5% | 4% | 1% | 3% | - | 12% | 3% | 2% | 4% | 3% | 3% | 4% | 2% | 4% | 3% | 2% | 4% | 3% | 2% | 6% |
| LIGHTNING | 3% | 4% | 4% | 2% | 3% | 3% | 8% | - | 4% | 2% | 2% | 2% | 3% | 3% | 1% | 4% | 2% | 3% | 4% | 2% | 3% | 3% |
| TRYING TO TELL US SOMETHING | 2% | 3% | 2% | 3% | 3% | 2% | - | 4% | 4% | 2% | 2% | 1% | 1% | 5% | 2% | 3% | 2% | 2% | 2% | 2% | 3% | 2% |
| HAVEN'T SEEN IT BEFORE/ENOUGH-WOULDN'T GUESS | 2% | 1% | - | 4% | - | 2% | - | - | 1% | 3% | 2% | 1% | 1% | 2% | 4% | 1% | 2% | 3% | - | 1% | 1% | - |
| ANY OTHER ANSWER | 8% | 11% | 8% | 6% | 9% | 10% | - | 11% | 9% | 5% | 8% | 6% | 11% | 9% | 10% | 9% | 7% | 7% | 5% | 9% | 9% | 9% |
| DO NOT KNOW | 6% | 7% | 5% | 7% | 4% | 8% | - | 17% | 6% | 3% | 6% | 3% | 5% | 10% | 18% | 7% | 2% | 3% | 4% | 6% | 5% | 4% |
| BASE | 755 | 215 | 193 | 226 | 121 | 257 | 11 | 24 | 199 | 118 | 181 | 209 | 262 | 279 | 89 | 417 | 248 | 104 | 85 | 269 | 76 | 190 |

# APPENDIX D

TABLE 84 A

Q.A4 — WHAT DO YOU THINK THIS FIGURE IS SUPPOSED TO REPRESENT? (COL 121-123)
FIGURE "A"

| | TOTAL | EAST | MID-WEST | SO-UTH | WEST | CI-TIES | OTHER FIVE | SIX | SUB-URBS | TO-WNS | RU-RAL | 18-29 | 30-49 | 50 & OVER | 8TH GR-ADE | HIGH SCH | COL-LEGE | PROF | EXEC | SKIL-LED LA-BOR | WH-ITE COL-LAR | UNION MBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ELECTRICITY | 13% | 17% | 5% | 12% | 18% | 20% | 7% | 8% | 13% | 5% | 7% | 13% | 14% | 11% | 8% | 14% | 13% | 13% | 9% | 14% | 14% | 13% |
| PPL WASTING/TAKING ADVANTAGE ENERGY/NOT CONSERVING | 10% | 13% | 11% | 7% | 10% | 9% | 17% | 10% | 10% | 7% | 13% | 14% | 10% | 7% | 2% | 10% | 12% | 13% | 9% | 9% | 6% | 11% |
| POWER/ELEC CO. MAK'G FUN PUBLIC/TELL'G ME TO GO TO HELL. ELEC CO. GETT'G BEST OF PPL | 9% | 14% | 8% | 5% | 12% | 6% | - | 12% | 11% | 12% | 10% | 5% | 11% | 11% | 7% | 8% | 13% | 13% | 14% | 7% | 12% | 11% |

| | TOTAL | EAST | MID-WEST | SOUTH | WEST | CITIES | OTHER FIVE | SIX | SUBURBS | TOWNS | RURAL | 18-29 | 30-49 | 50 & OVER | 8TH GRADE | HIGH SCH | COLLEGE | PROF | EXEC | SKILLED LABOR | WHITE COLLAR | UNION MBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SILLY/FOOLISH/CRAZY PERSON/STUPID PERSON | 7% | 9% | 7% | 5% | 10% | 9% | – | 13% | 7% | 7% | 6% | 7% | 10% | 5% | 6% | 6% | 10% | 12% | 9% | 7% | 7% | 9% |
| MAK'G FUN POWER COS/ENERGY/SPOOFING REDDY KILOWATT | 5% | 5% | 8% | 4% | 6% | 5% | 8% | – | 7% | 6% | 3% | 7% | 6% | 4% | 2% | 4% | 9% | 8% | 5% | 6% | 5% | 4% |
| LIKE SOMEONE/A KID MAK'G FACES/MAK'G FUN/GOOFING OFF | 5% | 5% | 5% | 4% | 6% | 4% | – | 9% | 7% | 4% | 6% | 3% | 6% | 6% | 3% | 5% | 5% | 3% | 7% | 5% | 5% | 6% |
| LIGHT BULB/LIGHT | 5% | 7% | 2% | 7% | 2% | 7% | – | 13% | 6% | – | 4% | 6% | 5% | 4% | 1% | 7% | 2% | – | 1% | 6% | 8% | 3% |
| REDDY KILOWATT/KILOWATT MAN/JOHNNY KILOWATT | 5% | 3% | 6% | 7% | 3% | 3% | 10% | – | 8% | 8% | 2% | 3% | 6% | 5% | 1% | 5% | 6% | 10% | 9% | 5% | 3% | 5% |
| HAVE NEVER SEEN IT | 5% | 2% | 7% | 7% | 2% | 3% | – | – | 5% | 8% | 4% | 4% | 5% | 5% | 5% | 5% | 4% | 4% | 4% | 5% | 3% | 4% |
| CARTOON/COMIC CHARACTER | 4% | 4% | 5% | 2% | 6% | 4% | – | 7% | 3% | 5% | 5% | 4% | 4% | 5% | 7% | 4% | 4% | 6% | – | 4% | 4% | 4% |
| SOMEBODY MAK'G FUN OF/LAUGHING AT YOU | 4% | 4% | 4% | 5% | 2% | 5% | – | 8% | 2% | 2% | 5% | 2% | 3% | 7% | 1% | 5% | 2% | 5% | 5% | 4% | 1% | 5% |
| ELECTRIC/POWER CO./UTILITY CO. (SPECIFIC) | 4% | 3% | 5% | 5% | 2% | 4% | 10% | – | 3% | 1% | 6% | 5% | 5% | 3% | 4% | 4% | 5% | 5% | 2% | 4% | 8% | 4% |
| ELECTRIC/POWER CO./UTILITY CO. (GEN) | 4% | 3% | 3% | 5% | 4% | 5% | – | – | 6% | 1% | 2% | 4% | 4% | 4% | 3% | 4% | 4% | 1% | 3% | 6% | 6% | 4% |
| ENERGY/POWER | 4% | 3% | 4% | 6% | 2% | 3% | 7% | – | 3% | 6% | 4% | 5% | 3% | 4% | 4% | 3% | 5% | 2% | 2% | 6% | 3% | 3% |
| REMIND'G YOU SAVE ENERGY/NOT WASTE ELEC/CONSERVE | 3% | 3% | 3% | 2% | 6% | 3% | – | 4% | 4% | 2% | 3% | 5% | 3% | 2% | 4% | 3% | 4% | 2% | 2% | 4% | 5% | 7% |
| HIGHER PRICES/RAISED COSTS | 3% | 2% | 4% | 2% | 2% | 3% | – | 4% | 2% | 3% | 2% | 3% | 2% | 2% | 1% | 3% | 3% | 5% | – | 4% | 4% | 2% |
| ANTI-ENERGY/SYMBOL DETRIMENTAL TO ELEC INDUSTRY | 2% | 1% | 4% | 2% | 1% | 2% | – | 4% | 2% | 3% | 3% | 1% | 3% | 2% | 1% | 3% | 2% | 2% | 5% | 2% | 2% | 2% |
| NOTHING | 2% | 2% | 4% | 1% | 3% | 1% | 10% | – | 2% | 3% | 3% | 4% | 2% | 1% | 2% | 1% | 5% | 6% | 1% | 2% | – | 2% |
| DEVIL/DEMON | 2% | 3% | 4% | 1% | – | 4% | 8% | 6% | 2% | 2% | • | 1% | 3% | 2% | 3% | 3% | 1% | 2% | 1% | 1% | 2% | 3% |
| SOMEONE SHOCKED BY ELEC/CHARGED UP W/ELECTRICITY | 2% | 2% | 2% | 3% | 1% | 1% | 7% | 3% | 3% | 1% | 2% | 2% | 3% | 2% | 3% | 2% | 1% | – | 1% | 2% | 5% | 1% |
| NEWSPAPER/TV AD | 2% | 1% | 2% | 3% | 1% | 2% | – | – | 2% | 1% | 2% | 3% | 1% | 2% | – | 2% | 2% | 1% | 1% | 2% | 3% | 2% |
| CLOWN/FUNNY MAN/LAUGHING FIGURE/JACK-IN-THE-BOX | 2% | 4% | 1% | 2% | – | 2% | 8% | – | 2% | 2% | 2% | 4% | 2% | • | – | 2% | 2% | 4% | – | 1% | 3% | 1% |
| NOISE/SHUT OUT NOISE | 2% | 2% | 1% | 2% | 2% | 1% | – | – | 2% | 3% | 3% | 1% | 1% | 3% | 1% | 2% | 2% | 3% | 2% | 1% | 1% | 2% |
| HAPPY/PLEASED/OVERJOYED PERSON/SOMEONE W/HAPPY LOOK | 2% | 2% | • | 2% | 2% | 2% | – | – | 1% | 3% | 1% | 1% | 2% | 2% | 1% | 2% | • | 1% | 2% | 3% | 1% | 1% |
| DENOTES SAFETY/DANGERS ELECTRICITY-WARNING ELECTRICAL DANGERS | 2% | 2% | 2% | 1% | – | 2% | – | 4% | 1% | 1% | 1% | 2% | 1% | 2% | 4% | 1% | 1% | – | 2% | 2% | – | 1% |
| TELL'G/SHOWING US SOMETHING | 1% | 1% | 2% | 1% | 1% | 1% | – | – | – | 2% | 3% | 1% | 2% | 1% | 1% | 2% | 1% | 2% | 2% | 1% | – | 2% |
| LIGHT/ELECTRICAL PLUG/OUTLET/SOCKET | 1% | 1% | 1% | 2% | – | 2% | – | 4% | 1% | 1% | 1% | 2% | 1% | 1% | – | 2% | • | – | 1% | 1% | – | – |
| PUBLIC SERVICE CHARACTER | 1% | – | 1% | • | 2% | 1% | – | – | 1% | – | 1% | 1% | • | • | – | 1% | 1% | – | 1% | • | 1% | • |
| LIGHTNING | 1% | 1% | • | – | – | 1% | – | – | 1% | – | – | – | 1% | • | 1% | • | • | – | 1% | • | – | – |
| ANY OTHER ANSWER | 10% | 12% | 6% | 9% | 14% | 11% | 10% | 9% | 10% | 13% | 7% | 7% | 11% | 12% | 12% | 10% | 10% | 11% | 9% | 11% | 13% | 13% |
| DO NOT KNOW | 15% | 13% | 13% | 19% | 16% | 17% | 31% | 22% | 14% | 14% | 15% | 13% | 13% | 19% | 33% | 15% | 11% | 10% | 18% | 14% | 14% | 13% |
| BASE | 743 | 215 | 192 | 216 | 120 | 257 | 11 | 24 | 196 | 117 | 173 | 207 | 258 | 274 | 85 | 414 | 243 | 103 | 83 | 268 | 76 | 188 |

# APPENDIX E

TABLE 87 A

Q.A7 – DO YOU THINK THAT THESE FIGURES ORIGINATE FROM THE SAME ORGANIZATION? (COL 126)
FIGURE "A"

| | | REGION | | | | AREA | | | | | | AGE | | | EDUCATION | | | TYPE OF WORK | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | EAST | MID-WEST | SOUTH | WEST | CITIES | OTHER FIVE | SIX | SUB-URBS | TOWNS | RURAL | 18-29 | 30-49 | 50 & OVER | 8TH GRADE | HIGH SCH | COLLEGE | PROF | EXEC | SKILLED LABOR | WHITE COLLAR | UNION MBR |
| FROM SAME ORGANIZATN | 56% | 63% | 56% | 52% | 54% | 61% | 10% | 77% | 65% | 43% | 49% | 60% | 55% | 55% | 47% | 59% | 55% | 52% | 56% | 58% | 55% | 56% |
| FROM TWO DIFFERENT ORGANIZATIONS | 30% | 28% | 32% | 27% | 34% | 26% | 61% | 20% | 22% | 39% | 37% | 30% | 32% | 27% | 21% | 30% | 32% | 35% | 34% | 32% | 21% | 34% |
| NOT SURE | 14% | 8% | 12% | 22% | 12% | 13% | 29% | 4% | 12% | 18% | 14% | 10% | 13% | 18% | 32% | 11% | 13% | 13% | 10% | 10% | 25% | 10% |
| BASE | 756 | 216 | 194 | 225 | 121 | 257 | 11 | 24 | 200 | 117 | 182 | 210 | 262 | 281 | 89 | 419 | 247 | 103 | 85 | 269 | 77 | 190 |

# APPENDIX F

TABLE C1 A

Q.A1 - WHAT DO YOU THINK THIS FIGURE IS SUPPOSED TO REPRESENT? (COL 115-117)
FIGURE "B"

| | TOTAL | EAST | MID-WEST | SO-UTH | WEST | CI-TIES | OTHER FIVE | SIX | SUB-URBS | TO-WNS | RU-RAL | 18-29 | 30-49 | 50 & OVER | 8TH GR-ADE | HIGH SCH | COL-LEGE | PROF | EXEC | SKIL-LED LA-BOR | WH-ITE COL-LAR | UNION MBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ELECTRICITY | 29% | 24% | 28% | 37% | 27% | 29% | 42% | - | 30% | 33% | 26% | 29% | 29% | 29% | 27% | 29% | 31% | 29% | 28% | 31% | 30% | 34% |
| ELECTRIC/UTILITY CO | 9% | 14% | 9% | 8% | 5% | 11% | 19% | - | 11% | 6% | 8% | 14% | 11% | 5% | 3% | 8% | 15% | 10% | 10% | 10% | 22% | 7% |
| FUNNY FACES/MAKING FUN/GOOFING OFF | 8% | 12% | 7% | 6% | 8% | 10% | 5% | - | 8% | 9% | 6% | 10% | 9% | 6% | 3% | 9% | 10% | 8% | 8% | 8% | 6% | 11% |
| REDDY KILOWATT/KILO-WATT MAN/JOHNNY KILOWATT | 8% | 5% | 8% | 10% | 8% | 8% | 9% | - | 4% | 16% | 6% | 7% | 9% | 7% | 6% | 8% | 8% | 12% | 9% | 10% | 3% | 8% |
| WASTING ENERGY/USING TOO MUCH ENERGY/CONSERVE | 8% | 10% | 7% | 6% | 8% | 9% | 5% | - | 6% | 9% | 6% | 8% | 9% | 6% | 6% | 7% | 10% | 11% | 12% | 5% | 8% | 8% |
| ENERGY/POWER | 7% | 7% | 8% | 5% | 11% | 6% | 6% | - | 12% | 7% | 5% | 7% | 8% | 7% | 3% | 7% | 10% | 8% | 13% | 8% | 2% | 10% |
| LIGHT BULB, LIGHT | 7% | 10% | 2% | 9% | 9% | 8% | 3% | - | 8% | 5% | 7% | 9% | 8% | 5% | 7% | 8% | 6% | 5% | 6% | 7% | 12% | 7% |
| POWER CO MAKING FUN/LAUGHING AT PUBLIC | 6% | 10% | 3% | 5% | 4% | 7% | 9% | - | 7% | 2% | 4% | 5% | 9% | 3% | 1% | 4% | 9% | 8% | 7% | 4% | 15% | 5% |
| ELECTRIC/UTILITY CO SPECIFIC (IE-PACI-FIC, CAROLINA, WESTINGHOUSE) | 5% | 3% | 5% | 6% | 5% | 6% | 7% | - | 3% | 5% | 6% | 7% | 5% | 3% | 2% | 4% | 7% | 8% | - | 5% | 6% | 4% |
| SYMBOL FOR ELECTRIC/ENERGY/ELECTRIC CO | 4% | 6% | 4% | 5% | 2% | 8% | 8% | - | 4% | 3% | 2% | 5% | 5% | 4% | 5% | 3% | 6% | 7% | 2% | 5% | 3% | 3% |
| CARTOON/COMIC CHARACTER | 4% | 4% | 5% | 2% | 4% | 5% | 3% | - | 4% | 5% | 2% | 2% | 3% | 6% | 4% | 4% | 4% | 5% | 5% | 4% | 2% | 6% |
| POWER CO TELLING PUBLIC:GOTCHA WHERE WE WANT YOU/CALLING PUBLIC SUCKERS | 4% | 6% | 4% | 2% | 2% | 5% | 5% | - | 4% | 3% | 1% | 4% | 5% | 2% | 1% | 4% | 5% | 5% | 8% | 3% | 3% | 5% |
| (PUBLIC) MAKING FUN OF/CRITICISING POWER COMPANIES | 3% | 5% | 4% | 2% | 3% | 3% | 3% | - | 4% | 3% | 3% | 4% | 5% | 2% | 1% | 2% | 6% | 4% | 4% | 3% | 9% | 3% |
| MAN/LITTLE MAN/ELECTRIC MAN | 3% | 1% | 4% | 4% | 4% | 2% | 5% | - | 3% | 3% | 5% | 3% | 3% | 4% | 6% | 4% | 2% | 2% | 4% | 2% | 3% | 2% |
| HAPPY/PLEASED/OVER-JOYED PERSON | 3% | 3% | 2% | 4% | 3% | 3% | 1% | - | 3% | 2% | 4% | 3% | 3% | 3% | 4% | 4% | 1% | 4% | 2% | 2% | 3% | 4% |
| ADVERTISEMENT/CO-MMERCIALS/POWER CO. ADS | 3% | 5% | 2% | 3% | 3% | 3% | 3% | - | 5% | 1% | 3% | 3% | 3% | 3% | 1% | 3% | 4% | 4% | 4% | 4% | 4% | 4% |
| DEVIL/DEMON | 3% | 3% | 2% | 4% | 4% | 2% | 2% | - | 4% | 2% | 3% | 2% | 2% | 4% | 4% | 4% | 2% | 2% | 4% | 3% | 3% | 2% |
| STUPID/SILLY/FOOLISH | 3% | 4% | 3% | 2% | 2% | 3% | 2% | - | 4% | 3% | 2% | 4% | 2% | 3% | 3% | 3% | 3% | 8% | 1% | 2% | - | 5% |
| NUTTY/WACKY/WEIRD PERSON | 3% | 3% | 2% | 4% | 2% | 2% | - | - | 4% | 3% | 2% | 4% | 2% | 2% | 2% | 2% | 4% | 3% | 2% | 3% | 2% | 3% |
| HIGHER PRICES/RAISED COSTS | 3% | 6% | 1% | 1% | 2% | 3% | 5% | - | 3% | 2% | 3% | * | 5% | 2% | 4% | 3% | 2% | 2% | 1% | 2% | 7% | 3% |
| LIGHTNING | 3% | 2% | 3% | * | 8% | 3% | - | - | 3% | 1% | 3% | 2% | 4% | 2% | 1% | 3% | 3% | 2% | 3% | 2% | 2% | 5% |
| HAVEN'T SEEN IT BEFORE/ENOUGH-WOULDN'T GUESS | 2% | 1% | 3% | 3% | 3% | 1% | 1% | - | 2% | 5% | 3% | 2% | 2% | 3% | 4% | 3% | 1% | 1% | 3% | 2% | - | 1% |
| CLOWN/JACK-IN-THE-BOX/CLOWN FACE | 2% | 1% | 2% | 2% | 3% | 3% | - | - | 1% | - | 3% | 4% | 2% | 1% | 1% | 2% | 2% | 4% | 3% | 1% | 5% | 1% |
| STICKING OUT TONGUE | 2% | 4% | 1% | * | 1% | 1% | - | - | 3% | 1% | 1% | 2% | 2% | 1% | - | 1% | 3% | 5% | 1% | 1% | 1% | 1% |
| CLOSED EARS/DOESN'T WANT TO HEAR/DEAF | 2% | 3% | 2% | 1% | 1% | 1% | - | - | 2% | 2% | 2% | 1% | - | 4% | 3% | 2% | - | 1% | - | 2% | 4% | 3% |
| NOTHING | 1% | 1% | 2% | 1% | 2% | * | - | - | 2% | - | 3% | 1% | 2% | 2% | 1% | 1% | 1% | 1% | 3% | - | | 2% |
| TRYING TO TELL US SOMETHING | 1% | 1% | 1% | 1% | 3% | 3% | 3% | - | 1% | - | 1% | 1% | 1% | 2% | 3% | 1% | 1% | 1% | 1% | 2% | - | 1% |
| SOMEONE SHOCKED BY ELECTRICITY/SOMEONE WHO HAS JUST GOT A SHOCK | 1% | 1% | - | 1% | - | - | - | - | 1% | 2% | * | ~ | * | 2% | - | 1% | 1% | - | 2% | * | | • |
| IDEA/BRAINSTORM EXPRESSION | * | - | * | * | 1% | * | - | - | * | 1% | * | - | 1% | 1% | 2% | * | - | - | - | 1% | 1% | 1% |
| PUBLIC SERVICE CHARACTER | * | * | 1% | * | ~ | 1% | 1% | - | ~ | 1% | 1% | 1% | * | * | ~ | 1% | * | - | 2% | * | - | 1% |
| ANY OTHER ANSWER | 12% | 13% | 12% | 4% | 21% | 14% | 9% | - | 11% | 9% | 11% | 11% | 9% | 15% | 14% | 12% | 11% | 9% | 10% | 13% | 11% | 14% |
| DO NOT KNOW | 8% | 6% | 11% | 9% | 7% | 6% | - | - | 10% | 6% | 11% | 8% | 7% | 9% | 17% | 8% | 5% | 4% | 8% | 8% | 5% | 4% |
| BASE | 760 | 216 | 209 | 199 | 136 | 241 | 55 | 0 | 212 | 120 | 187 | 212 | 258 | 287 | 109 | 391 | 260 | 105 | 86 | 263 | 60 | 195 |

# APPENDIX G

TABLE C4 A

Q.A4 — WHAT DO YOU THINK THIS FIGURE IS SUPPOSED TO REPRESENT? (COL 121-123)
FIGURE "B"

| | TOTAL | EAST | MID-WEST | SO-UTH | WEST | CI-TIES | OTHER FIVE | SIX | SUB-URBS | TO-WNS | RU-RAL | 18-29 | 30-49 | 50 & OVER | 8TH GR-ADE | HIGH SCH | COL-LEGE | PROF | EXEC | SKIL-LED LA-BOR | WH-ITE COL-LAR | UNION MBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ELECTRICITY | 34% | 30% | 29% | 39% | 39% | 35% | 48% | - | 28% | 36% | 37% | 34% | 32% | 35% | 34% | 34% | 33% | 30% | 32% | 36% | 40% | 31% |
| ELECTRIC/POWER CO./UTILITY CO. (GEN) | 15% | 23% | 13% | 11% | 11% | 19% | 27% | - | 17% | 9% | 10% | 17% | 20% | 9% | 6% | 15% | 18% | 16% | 18% | 18% | 23% | 12% |
| LIGHT BULB/LIGHT | 14% | 17% | 12% | 13% | 16% | 16% | 6% | - | 17% | 8% | 12% | 16% | 14% | 14% | 14% | 15% | 13% | 16% | 24% | 11% | 12% | 11% |
| RCODY KILOWATT/KILOWATT MAN/JOHNNY KILOWATT | 9% | 4% | 15% | 7% | 12% | 9% | 15% | - | 6% | 16% | 10% | 8% | 12% | 8% | 7% | 10% | 9% | 11% | 11% | 11% | 7% | 9% |
| REMIND'G YOU SAVE ENERGY/NOT WASTE ELEC/CONSERVE | 9% | 10% | 11% | 6% | 11% | 9% | - | - | 11% | 8% | 7% | 12% | 8% | 7% | 2% | 9% | 12% | 11% | 12% | 8% | 4% | 13% |
| ELECTRIC/POWER CO./UTILITY CO. (SPECIFIC) | 8% | 8% | 6% | 10% | 7% | 7% | 10% | - | 6% | 9% | 10% | 9% | 9% | 6% | 5% | 8% | 8% | 11% | 4% | 8% | 6% | 9% |
| LIGHT/ELECTRICAL PLUG/OUTLET/SOCKET | 7% | 5% | 10% | 5% | 8% | 8% | 2% | - | 10% | 2% | 7% | 6% | 6% | 9% | 6% | 8% | 7% | 9% | 10% | 6% | 5% | 6% |
| TELL'G/SHOWING US SOMETHING | 7% | 10% | 7% | 6% | 5% | 6% | 7% | - | 5% | 8% | 6% | 6% | 7% | 7% | 8% | 6% | 8% | 10% | 5% | 7% | 8% | 8% |
| ENERGY/POWER | 6% | 4% | 3% | 5% | 16% | 3% | - | - | 8% | 6% | 7% | 6% | 4% | 7% | 7% | 5% | 7% | 9% | 11% | 4% | 2% | 5% |
| HAPPY/PLEASED/OVER-JOYED PERSON/SOMEONE W/HAPPY LOOK | 6% | 7% | 6% | 3% | 6% | 6% | - | - | 6% | 7%. | 3% | 6% | 5% | 5% | 4% | 6% | 5% | 7% | 4% | 5% | 5% | 6% |
| NEWSPAPER/TV AD | 5% | 9% | 2% | 5% | 6% | 6% | 10% | - | 7% | 6% | 3% | 5% | 7% | 4% | 6% | 4% | 6% | 7% | 5% | 6% | 9% | 3% |
| CARTOON/COMIC CHARACTER | 2% | 2% | 3% | 2% | 2% | 3% | - | - | 1% | 3% | 2% | 2% | • | 4% | 3% | 2% | 2% | 2% | 1% | 3% | - | 3% |
| SOMEBODY MAK'G FUN OF/LAUGHING AT YOU | 1% | 1% | 1% | 2% | 1% | 2% | 1% | - | 3% | - | 1% | 2% | 2% | 1% | 2% | 2% | 1% | 2% | 1% | 2% | - | 1% |
| NOTHING | 1% | 2% | 2% | • | 1% | 1% | 1% | - | 1% | 2% | 2% | 1% | 1% | 2% | 1% | 2% | • | • | 2% | 1% | 1% | 2% |
| POWER/ELEC CO. MAK'G FUN PUBLIC/TELL'G ME TO GO TO HELL. ELEC CO.. GETT'G BEST OF PPL | 1% | 2% | 1% | • | 2% | 1% | 4% | - | 2% | - | 2% | 1% | 1% | 2% | 1% | • | 3% | 1% | 3% | 1% | 4% | 1% |
| HAVE NEVER SEEN IT | 1% | - | 1% | 3% | 2% | 1% | - | - | 1% | 1% | 2% | 3% | 1% | 1% | 2% | 1% | 1% | 1% | 1% | • | 3% | 1% |
| HIGHER PRICES/RAISED COSTS | 1% | 2% | 2% | 1% | - | 1% | 2% | - | 1% | 2% | 2% | 1% | 2% | 1% | 2% | 1% | 1% | 1% | - | 2% | 2% | 2% |
| PPL WASTING/TAKING ADVANTAGE ENERGY/NOT CONSERVING | 1% | 1% | 1% | 1% | 1% | 2% | 4% | - | 2% | - | • | 1% | 2% | • | 1% | 1% | 1% | - | 1% | • | 1% | 2% |
| LIKE SOMEONE/A KID MAK'G FACES/MAK'G FUN/GOOFING OFF | 1% | 2% | 2% | 1% | - | 2% | 1% | - | 2% | 1% | - | 1% | 2% | 1% | - | 1% | 2% | 1% | 1% | 1% | 2% | 1% |
| LIGHTNING | 1% | 1% | 2% | - | 2% | 2% | - | - | 1% | 2% | - | - | 1% | 2% | 1% | 1% | 1% | - | 1% | 1% | 3% | 1% |
| SILLY/FOOLISH/CRAZY PERSON/STUPID PERSON | 1% | • | - | 2% | 2% | • | 2% | - | 2% | - | 1% | • | 1% | 2% | 1% | 1% | 2% | - | 1% | 2% | 1% | 1% |
| DEVIL/DEMON | 1% | 1% | 2% | 1% | - | 1% | - | - | • | 1% | 1% | 1% | 1% | 1% | - | 1% | 1% | - | - | 2% | 2% | 1% |
| DENOTES SAFETY/DANGERS ELECTRICITY-WARNING ELECTRICAL DANGERS | 1% | - | • | 2% | 1% | 1% | - | - | 1% | 2% | 1% | 1% | 1% | • | 2% | • | 1% | 1% | 1% | • | 1% | 1% |
| MAK'G FUN POWER COS/ENERGY/SPOOFING REDDY KILOWATT | 1% | 1% | - | 1% | 2% | 1% | - | - | 1% | - | 1% | 1% | • | • | - | 1% | • | 1% | 1% | - | - | - |
| PUBLIC SERVICE CHARACTER | 1% | - | 1% | 1% | - | 1% | 5% | - | - | 1% | - | 1% | • | 1% | - | 1% | • | - | 1% | 2% | - | - |
| CLOWN/FUNNY MAN/LAUGHING FIGURE/JACK-IN-THE-BOX | • | - | - | 1% | 1% | - | - | - | • | 1% | 1% | - | - | 1% | - | 1% | • | 1% | - | 1% | - | 1% |
| ANTI-ENERGY/SYMBOL DETRIMENTAL TO ELEC INDUSTRY | • | 1% | - | 1% | 1% | - | - | - | 1% | - | • | - | 1% | • | - | 1% | • | 1% | 1% | - | - | - |
| SOMEONE SHOCKED BY ELEC/CHARGED UP W/ELECTRICITY | • | - | 1% | 1% | - | 1% | - | - | - | 1% | - | 1% | - | • | - | • | • | - | - | - | - | 1% |
| NOISE/SHUT OUT NOISE | • | 1% | - | - | 1% | 1% | 3% | - | • | - | -• | - | • | 1% | 1% | - | 1% | - | - | 1% | - | - |
| ANY OTHER ANSWER | 14% | 14% | 15% | 12% | 14% | 14% | 15% | - | 15% | 9% | 15% | 11% | 16% | 13% | 20% | 11% | 15% | 13% | 16% | 12% | 12% | 16% |
| DO NOT KNOW | 10% | 8% | 11% | 12% | 12% | 7% | - | - | 13% | 11% | 11% | 8% | 8% | 15% | 17% | 12% | 6% | 10% | 12% | 7% | 11% | 7% |
| BASE | 764 | 216 | 211 | 201 | 136 | 243 | 56 | 0 | 212 | 120 | 189 | 213 | 258 | 290 | 109 | 393 | 262 | 105 | 88 | 264 | 60 | 196 |

## APPENDIX H.

TABLE C7 A

Q.A7 - DO YOU THINK THAT THESE FIGURES ORIGINATE FROM THE SAME ORGANIZATION? (COL 126)
FIGURE "B"

| | TOTAL | REGION | | | | | | | AREA | | | | AGE | | | EDUCATION | | | | TYPE OF WORK | | | | UNION |
| | | EAST | MID-WEST | SO-UTH | WEST | CI-TIES | OTHER FIVE | SIX | SUB-URBS | TO-WNS | RU-RAL | 18-29 | 30-49 | 50 & OVER | 8TH GR-ADE | HIGH SCH | COL-LEGE | PROF | EXEC | SKIL-LED LA-BOR | WH-ITE COL-LAR | MBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FROM SAME ORGANIZATN | 66% | 67% | 65% | 64% | 70% | 66% | 67% | - | 69% | 63% | 66% | 67% | 61% | 71% | 62% | 69% | 64% | 60% | 67% | 66% | 76% | 67% |
| FROM TWO DIFFERENT ORGANIZATIONS | 24% | 23% | 27% | 21% | 25% | 28% | 27% | - | 23% | 23% | 20% | 25% | 31% | 16% | 20% | 22% | 28% | 30% | 28% | 23% | 21% | 25% |
| NOT SURE | 10% | 10% | 9% | 15% | 6% | 7% | 7% | - | 8% | 14% | 15% | 8% | 8% | 14% | 18% | 10% | 8% | 10% | 5% | 11% | 4% | 8% |
| BASE | 764 | 216 | 210 | 203 | 135 | 243 | 56 | 0 | 211 | 120 | 190 | 213 | 259 | 289 | 108 | 393 | 263 | 106 | 88 | 265 | 59 | 198 |